**HUGHES AIRCRAFT COMPANY**

v.

**The UNITED STATES.**

No. 426–73.

United States Court of Claims.

Dec. 17, 1980.

Abe Fortas, Washington, D. C., attorney of record, for plaintiff. Sheldon Karon, Victor G. Savikas, Dugald S. McDougall, Chicago, Ill., and John A. Sarjeant, Los Angeles, Cal., of counsel.

James D. Stokes, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant.

Thomas J. Byrnes, Dept. of Justice, Washington, D. C., Major Milburn K. Concannon, Jr. and Vince Cleary, Dept. of the Air Force, and Robert Kinberg, Washington, D. C. and Paul F. McCaul, National Aeronautics and Space Administration, of counsel.

Before FRIEDMAN, Chief Judge, SKELTON, Senior Judge,* and KUNZIG, Judge.

OPINION

FRIEDMAN, Chief Judge:

This is a suit under 28 U.S.C. § 1498 (1976) seeking damages for the alleged infringement of plaintiff's patent No. 3,758,-051 by the United States. After trial, Trial Judge Colaianni held that the patent is invalid under 35 U.S.C. § 102(b) (1976), which bars the issuance of a patent if "the invention was . . . described in a printed publication . . . or in public use . . . in this country, more than one year prior to the date of the application for patent."

Upon the plaintiff's exceptions to that decision, we reject the trial judge's conclusion and remand the case to him to determine the other issues in the case.[1]

I.

Following the Soviet Union's launching in 1957 of SPUTNIK, the world's first artificial satellite, the Department of Defense and the National Aeronautics and Space Administration accelerated their efforts to create an effective synchronous satellite. A synchronous satellite is one whose orbital period is equal to the rotational period of the earth; the satellite would "hover" above a single, fixed point on earth. The satellite must be placed in a west-to-east orbit having a 22,750 nautical mile radius from the center of earth and a linear velocity of 10,090 feet per second.

---

* Judge Skelton's dissenting opinion follows the CONCLUSION of the court at the end of the opinion of Chief Judge Friedman.

1. Although the court rejects the trial judge's recommended conclusion of law, we adopt most of his findings of fact, which we are not printing since such facts as are necessary to our decision are contained herein. We have modified findings 63, 74, 85, 90, and 97, as set out in a separate order entered this day. The court also deletes finding 106 because it is unnecessary to the determination of the present issue, and finding 113 as erroneous as a matter of law.

In order to conserve weight and energy, communications satellites are equipped with directional antennas, and communication with earth is possible only when the satellite is oriented or positioned so that the directional beam can strike earth. Similarly, the solar cells used as a power source work most effectively when they are directed toward the sun. It is therefore essential that the communications satellite be equipped with a control system by which the proper orientation may be maintained.

The patent involved in this case—which Williams invented and assigned to the plaintiff—provides a sophisticated method for changing and therefore controlling the orientation of a satellite (also known as its attitude) in flight. In oversimplified terms, the invention consists of a process by which the orientation of the satellite can be changed in flight by the discharge from the satellite through openings on its surface of synchronized jet blasts of gas into the atmosphere. The proper timing and duration of those blasts are controlled through radio signals transmitted to the satellite from earth that activate and time the blasts. These instructions are sent following the receipt on earth of radio signals from the satellite that indicate the position and attitude of the body, on the basis of which calculations are made on earth which determine the instructions sent to the satellite. The control signals sent from earth are synchronized with the spin cycle of the satellite, thereby activating the jet pulses in the proper phase of the spin cycle.

Williams filed his first application for a patent of the foregoing invention in April 1960. This application claimed the device described above, but did not describe the means to be used on earth to receive information from the satellite, make calculations, and transmit instructions to the satellite. After extensive proceedings before the Patent Office, in which the application was amended several times in attempts to satisfy the questions and doubts of the patent examiner, on April 21, 1964, Williams filed a continuation-in-part (CIP) application, on the basis of which the patent issued in September 1973.

A CIP application may contain subject matter from a prior application and additional matter not disclosed in the earlier application. Under 35 U.S.C. § 120 (1976), any new matter in the CIP application has the filing date of that application; the earlier filing date of the prior application covers only material in the CIP application that also was disclosed in the prior application. The Williams CIP application for the first time described and disclosed in a drawing (Figure 12 of the application) the control device on earth that received radio signals from and transmitted them to the satellite.

In 1962, more than a year prior to the filing of the CIP application, Williams had described his invention in a paper given before the American Astronautical Society, and the invention had been publicly used in the SYNCOM satellite launched by the United States in 1963.

The patent that issued on the CIP application contains three claims, described below. If any of these claims in fact claims the Figure 12 control device as an element of the patented invention, the patent concededly is invalid under 35 U.S.C. § 102(b), because of the public disclosure of the invention more than a year before the CIP application was filed. The trial judge held that the patent does claim the control device and therefore is invalid. We reach a contrary conclusion.

II.

A. The governing principles are well-settled; the dispute is over their application to the facts here. Under 35 U.S.C. § 112 (1976), a patent application must include a specification containing

a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The section further provides that the specification "shall conclude with one or more claims, particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." "[T]he claims made in the patent are the sole measure of the grant." *Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 339, 81 S.Ct. 599, 600, 5 L.Ed.2d 592 (1961). *See also Interdent Corp. v. United States*, 209 Ct.Cl. 301, 306, 531 F.2d 547, 550 (1976).

The claims define the inventive concept that the patent embodies. The specifications, on the other hand, are designed to reveal how the invention may be put into practice, thereby defining the inventor's monopoly and enabling others to practice the invention after the patent has expired. Although "it is fundamental that claims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention," *United States v. Adams*, 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966), courts do "not read limitations into claims merely because they are disclosed in the specifications," *In re Walter*, 618 F.2d 758, 768 (C.C.P.A.1980). *See also In re Prater*, 415 F.2d 1393, 1404 (C.C.P.A.1969) (specifications properly used to "interpret limitations explicitly recited in the claim").

B. The Williams patent contains three claims.

The pertinent portion of claim 1, the broadest of the allowed claims, is as follows:

1. Apparatus comprising:

    \*    \*    \*    \*    \*    \*

    e. means disposed on said body for providing an indication to a location external to said body of the instantaneous spin angle position of said body about said axis and the orientation of said axis with reference to a fixed external coordinate system;

    f. and means disposed on said body for receiving from said location control signals synchronized with said indication;

    g. said valve being coupled to said last-named means and responsive to said control signals for applying fluid to said fluid expulsion means in synchronism therewith for precessing said body to orient said axis in a predetermined desired relationship with said fixed external coordinate system.

Insofar as they are material in this case, the only differences between these clauses in claims 1, 2, and 3 is that the word "means" in clause e of claim 1 is changed to "wide angle means" in claim 2 (clause f) and to "wide angle optical means" in claim 3 (clause e).

These claims do not incorporate the ground control device depicted in Figure 12. The trial judge stated that

what is being claimed by elements (e)–(g) is [1] apparatus carried by the satellite for transmitting information about its spin angle position to an external location, *i. e.*, earth; [2] externally located apparatus for producing control signals which are synchronized with the spin angle position of the satellite; and [3] apparatus on the satellite for responding to the received control signals for precessing the satellite.

But only the first and third of these three apparatuses are stated in the language of those clauses.

The claims do not refer to any "externally located apparatus." The only references in the claims to anything external to the satellite are to "means disposed on said body for providing an indication to *a location external to said body*" and to means on the body for receiving signals "from said location" (items e and f, emphasis added). Although some devices and processes are necessary at the external location to receive and process the information sent there by the clause e "means" and to return the instructions relied on by the clause f "means," the claims themselves do not embody any specific devices or processes outside the satellite.

The claims of the patent cover solely the orbiting satellite and no other object, device, means, or apparatus. The patent

claims only an "apparatus comprising . . . a body adapted to spin about an axis" (claim 1, clause a), with certain specified features; every successive clause of the claims covers one such feature and specifically relates back either to the "body" itself or to some other means or device attached to that body.

The only references in the claims to anything outside the satellite do not mention any ground-based device, let alone the specific ground-based device depicted in Figure 12. The claims of clauses e and f each comprise a means for performing a specified function and a statement of the function. *See* 35 U.S.C. § 112 (1976). The means claimed in both clauses are "disposed on said body," the "body" being the satellite.

These clauses do not claim or otherwise refer to any "means disposed" at the external location. While the functions there stated include interaction with the undescribed ground station—"providing an indication to a location external" and "receiving from said location control signals"—the functions claimed are those of the described means disposed on the satellite and are described from the perspective of the satellite, not the external location. On the other hand, the claims are silent about the functions performed at the external location (as well as all of the means used to accomplish those functions)—receipt of information from the satellite, performance of certain calculations, and transmission of instructions back to the satellite.

C. The specifications do not establish that the ground control device illustrated in Figure 12 is an element of the Williams patent. The specifications do not define the particular ground control device shown in Figure 12 as essential to the operation of the apparatus described in the claims. Instead, the specifications merely state that "[a]s an *example* of *one means* of controlling the starting time and duration of pulses to the jet control valves 54 and 55, in such a way as to result in thrust during the correct portion of each spin revolution, cam-controlled contracts or switches *may* be used" (col. 9, lines 25–29) (emphasis added).

The patentee's use of this language indicates that he did not then view the Figure 12 device as the exclusive method of accomplishing properly synchronized jet pulses. Rather than describing an element of the invention, which the claims show to be only a satellite-based apparatus, the specifications give an illustrative example of the kind of ground-based device that could be used in connection with the operation of the apparatus described in the claims. The specifications permit the use of any other means in lieu of the cam device that would achieve the same result.[2] Indeed, the only part of the addition to the specifications made in the CIP application that appears crucial to the invention is the spherical trigonometric equation, the use of which is described in column 10, lines 20–50. This is almost certainly not patentable. *See, e. g., In re Christensen*, 478 F.2d 1392 (C.C.P.A.

2. The specifications explicitly state that one element of the Figure 12 device is replaceable by a different mechanism with the same function:

> In the present example, the frequency of the signal from the variable frequency oscillator 123 is adjusted to cause time coincidence. It is also possible to measure the difference in time electronically and to develop suitable electrical signals for automatic control of the speed of the motor 121 which will cause the time difference to approach zero.

(Col. 9, lines 51–58). Here once again the specifications refer to the description of the operation of the Figure 12 device as the "present example."

Devices other than that portrayed in Figure 12 have been used in its stead. As Hughes scientist Harold A. Rosen stated in his deposition:

> The whole idea is simply to send—to command pulses on the thruster of a phase that causes it to precess in the desired direction, and all you need to do that is some means of knowing the spin phase and some means of sending commands to the satellite; and we've had a fairly large number of different means of mechanizing it on the ground through the years. It started off with a mechanical system that was—in which an actual rotating drum was synchronized with the satellite's rotation frequency, and soon after that we decided an electronic system would be easier to do. . . .

1973) (mathematical equations do not create patentable property rights).[3]

The history of the patent application itself shows that Williams, the inventor of the satellite, did not view the ground control device as part of his invention. In view of the vigor with which he prosecuted that application, he would not have jeopardized the grant of the patent by disclosing his invention in public print in 1962 and permitting it to be publicly used in 1963 if he had believed that the invention included the ground control device, which he did not disclose until he filed the CIP application in 1964.

In sum, the Williams application sought a patent upon a satellite and a satellite only. Although the application referred to a ground control system, this was unavoidable since it was impossible to disclose how the externally operated satellite functions without disclosing the external means of control. The discussion and illustration of the ground control device in the CIP application was added only because the patent examiner requested that additional information. This material was included in order to clarify how the satellite could be used; it was not included for the purpose of describing in greater detail the invention itself. The invention was the satellite.

### III.

The reason the trial judge concluded that the patent claims the Figure 12 ground controller is that because some external control device is essential to the operation of the Williams attitude control system, the patent for such a system necessarily must claim some external control device (and the Figure 12 device is the only one described in the patent). This view is at odds with the basic principle that it is not necessary to claim in a patent every device required to enable the invention to be used. As this

court stated in *Adams v. United States*, 165 Ct.Cl. 576, 581, 330 F.2d 622, 626 (1964), *aff'd*, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966):

> It is evident that this section [35 U.S.C. § 112] does not require an inventor to disclose every possible way in which his invention may be used, nor does it limit the claims of the patent to the particular mode which the inventor considers best at the time of filing his application for patent.

*See also Smith v. Snow*, 294 U.S. 1, 11, 55 S.Ct. 279, 283, 79 L.Ed. 721 (1935); *Deering v. Winona Harvester Works*, 155 U.S. 286, 302, 15 S.Ct. 118, 124, 39 L.Ed. 153 (1894); *In re Anderson*, 471 F.2d 1237 (C.C.P.A. 1973).

In *Deering*, the Supreme Court stated that although "additional elements are necessary to render the device operative, it does not necessarily follow that the omission of these elements invalidates the claim, or that the precise elements described in the patent as rendering it operative must be read into the claim." 155 U.S. at 302, 15 S.Ct. at 124. As an illustration the Court pointed out that "[t]he invention of a needle with the eye near the point is the basis of all the sewing machines used; but the methods of operating such a needle are many," and that the inventor of the sewing machine needle was not required to claim in his patent every machine in which the needle could be used or to restrict his patent to the method of use described in the application. *Id.*

The same is true of the Williams attitude control system. It, like the needle, requires additional devices to make it operational, and there are many such devices (*see* note 2, *supra*). The specific ground control device described in the Williams patent is not an essential aspect of the invention, and the patent, like the patent for the sewing ma-

---

**3.** During the Patent Office proceedings Williams filed a number of superseding claims, many of which the patent examiner rejected. The language of the examiner's final rejection of claims 15–19 of the parent application indicates that it was the absence of this formula, and not the absence of a description of a ground-control device, that in his view made the disclosure there inadequate: "There is nothing in the original disclosure to indicate how the starting and stopping time or duration of the pulses is determined by the instantaneous angle of revolution of the body with respect to a reference point."

chine needle, is not limited to that one specific example. Just as the innovative aspect of the sewing machine needle was that the needle could be powered by a machine, so the innovative aspect of the Williams invention is that the attitude control system may be controlled from the ground. In neither case did the inventor of the patentable device (the needle and the attitude control system controlled from the ground) also invent the device in conjunction with which the patented item was used (the sewing machine and the ground controller).

The principle reflects the practical reality that most inventions are designed to be used with other devices, both patented and unpatented. That fact, however, does not mean that the patented device necessarily also includes the other device in conjunction with which it is to be operated. Well-known examples are radio-operated garage door openers, in which a radio transmitter in the automobile or outside the garage activates the opening and closing mechanism of the garage door, and television set receivers, which cannot function without the signals transmitted from the broadcasting stations. The defendant concedes that "radio receivers and garage door openers can be and are claimed by themselves without also reciting the remotely located signal transmitter equipment." It urges, however, that these devices differ from the Williams invention because both the garage door mechanism and the television set only receive signals, while the ground control device and the satellite both receive and transmit them.

This distinction is unconvincing. The need to use a separate device to enable a patented device to function is the same whether the separate apparatus merely receives or both receives and transmits radio signals. The critical fact is that the Williams invention, no less than the automatic garage door opener and the television set, can function only in conjunction with a signal from another device. In all three instances that other device is not a part of the patented invention, but merely a separate apparatus which is required to be used when the invention operates.

The fact that the patentee amended his application to show and describe the ground control device does not establish that that device was an essential element of the invention that the claims covered. The problem with the original application with respect to the ground control device was not the failure to *claim* such a device (since it was not a part of the invention), but to give sufficient information regarding the ground control device to enable one skilled in the art to practice the invention.

It was this deficiency in the information about the ground control device contained in the original application that the amplification of the specifications in the CIP application was designed to correct. That was a proper use of a CIP application. Such an application may, for example, contribute a "mere embellishment, or technical improvement, of a feature disclosed in the original application, which does not contribute to its novelty, utility, or non-obviousness," *Acme Highway Products Corp. v. D. S. Brown Co.,* 431 F.2d 1074, 1080 (6th Cir. 1970), *cert. denied,* 401 U.S. 956, 91 S.Ct. 977, 28 L.Ed.2d 239 (1971), or may merely elaborate on the disclosures of earlier applications, *see Azoplate Corp. v. Silverlith, Inc.,* 367 F.Supp. 711, 732 (D.Del. 1973), *aff'd,* 506 F.2d 1050 (3d Cir. 1974), *cert. denied,* 421 U.S. 914, 95 S.Ct. 1572, 43 L.Ed.2d 780 (1975).

## IV.

In addition to the defendant's contention that the patent was invalid under 35 U.S.C. § 102(b), the parties have raised various other issues. They include the validity of the patent under the nonobviousness standard of 35 U.S.C. § 103, the plaintiff's alleged "misrepresentation and other inequitable conduct," and the defendant's alleged infringement of the patent. Although the trial judge did not decide any of these other issues, the parties urge us to do so, and they have extensively briefed the questions before us.

We decline to decide those other issues. We think that the ultimate resolution of

these complex and technical questions would be aided if the trial judge initially examined and evaluated them.

## CONCLUSION

The Williams patent is not invalid under 35 U.S.C. § 102(b). The case is remanded to Trial Judge Colaianni to file a recommended decision and findings on the other issues presented.

SKELTON, Senior Judge, dissenting:

I respectfully dissent, as it is my opinion that the very able recommended decision of Trial Judge Colaianni that the subject invention is invalid is fully supported by the facts and the law, whereas, the decision of the majority that the invention is valid is clearly contrary to the evidence and the applicable law. I adopt the Trial Judge's findings of fact, decision, and conclusion of law as my dissent, along with additional comments and reasons as follows:

### OPINION *

COLAIANNI, Trial Judge: The Hughes Aircraft Company seeks reasonable and entire compensation, pursuant to 28 U.S.C. § 1498, for the unlicensed use by defendant of United States Patent No. 3,758,051. This patent relates to a general attitude control system (ACS) for spacecraft, first used in the Hughes-manufactured SYNCOM II and SYNCOM III satellites, the world's first synchronous communications satellites.[1] This invention was allegedly used by the United States in its SKYNET II, NATO II, DSCS II, IMP (–H and –J), SOLRAD (9 and 10), and PIONEER (10 and 11) satellites. The Government denies infringement, and disputes the validity and/or enforceability of the patent in suit.

* The trial judge's recommended decision and conclusion of law are submitted in accordance with Rule 134(h).

1. The patent in suit, United States Patent No. 3,758,051 for velocity control and orientation of a spin-stabilized body, was issued to Donald D. Williams on September 11, 1973, on an application filed August 21, 1964. This patent is a continuation-in-part of Serial No. 22,733, filed April 18, 1960, now abandoned.

### I. The Communications Satellite Design Problem

An early goal of the space program was the development of a synchronous communications satellite.[2] A network of such satellites was contemplated to enable worldwide radio coverage of events.

In the late 1950's and early 1960's the launch vehicles used for propelling rockets were of limited capacity and capable of lifting only the smallest of payloads. Accordingly, designers in the early days of satellites were necessarily obsessed with weight considerations. To economize on power and weight, the communications satellites were equipped with directional antennas. Ironically, elaborate pointing systems seemed necessary to keep the earth within the narrow antenna beams. These systems, which employed three sets of gyroscopes and rocket motors (three-axis ACS), proved too heavy to be lifted into synchronous orbit by the available launch vehicles.

### II. Developments at Hughes

The use of jet vanes, spin nozzles or spin rockets, to rotate various stages of the rocket used to convey a satellite into orbit about its longitudinal axis for stability, was well known. As a result, a satellite will have a spin imparted to it as it assumes its spacial orbit. Hughes' engineers, Harold A. Rosen and Donald D. Williams, realized that the continual correction of a satellite's attitude was unnecessary, since the orientation of a spinning satellite is not affected by its orbital motion. They decided to take advantage of this phenomenon.

Even with the advantage of the above phenomenon, Hughes faced numerous formidable hurdles that had to be overcome in order to ensure acceptable communication

2. A radio communication satellite must be placed in a west-to-east circular orbit in the earth's equatorial plane, and have a period of 24 hours. In order to "hover" above a single point on earth, the satellite must be placed in an orbit having a 22,750 nautical mile radius from the center of the earth and travel around the orbit at a linear velocity of 10,090 ft. per second.

between the high altitude orbital position of the satellite and earth. In the first place, the satellite transmitter required a certain degree of antenna directivity. A "pancake" beam antenna was selected as the simplest technique compatible with spin-stabilization. However, this type of antenna is useful only when the earth is in the plane of the pancake beam. Thus, to obtain continuous maximum antenna gain, the spin axis of the satellite must be normal to the plane of the orbit. Moreover, the array of glass-coated solar cells which covered the exterior of the satellite and acted as the satellite's power supply required as much exposure to the sun as possible.

For ballistic reasons, a communications satellite will be injected into orbit with its spin axis lying in its orbital plane. Thus, to obtain maximum gain from the pancake beam antenna, and, as well, to obtain maximum performance from the solar cell power supply, it is necessary to reorient the spin axis of the satellite through 90 degrees. For this reason, Messrs. Rosen and Williams suggested that the satellite be equipped with a set of spin jets, which, when pulsed, would cause the satellite to spin about the antenna axis. Reorientation would consist of stopping the old spin and initiating the new.

The Rosen-Williams ACS was described in a patent application filed December 30, 1959, and issued as patent No. 3,398,920 on August 13, 1968. The inventors recognized that theirs was not a complete solution to the attitude control problem, since, among other things, solar radiation and magnetic fields would gradually disturb the orientation of the satellite, and their ACS reorientation capabilities were limited.

Subsequent work by Mr. Williams led to the realization that a single jet, mounted parallel to the antenna axis, but offset therefrom, could be used to precess[3] a satellite into a desired orientation. The Williams system achieved greatly improved results over the Rosen-Williams ACS.

The first written description of the invention appeared in a January 1960 confidential report on the status of Hughes' Commercial Communication Satellite (COMSAT). This report disclosed a spin-stabilized satellite equipped with a directional antenna, a V-beam sun sensor, and a *ground-commandable* precessing jet.

On April 2, 1960, Williams reduced his invention to practice by a dynamic model which included a spinning wheel supported on a universal joint, with a gas jet pulsed to precess the wheel's spin axis.[4]

III. *The Original Williams Application*

On April 18, 1960, Williams filed the parent application on the invention in suit. This application contained essentially the same Figs. 1–11 and their accompanying descriptions as are found in the patent in suit. It did not contain either Fig. 12, which illustrates a ground-based controller for synchronizing a ground-originating control signal, which is to actuate the satellite's attitude control jet, with the spin cycle of the satellite, nor the accompanying description.

The 1960 application purported to describe a method and apparatus for controlling the orientation of the spin axis of a spin-stabilized space vehicle. As an exemplary embodiment of the invention, the specification and drawings presented an earth-orbiting, spin-stabilized satellite. The satellite was equipped with a pancake beam directional antenna, a V-beam sensor, and, ignoring the velocity control valve since it does not appear in any of the claims in suit, an axial fluid jet offset from the spin axis for correcting the attitude of the satellite.

Obviously, before any correction in attitude takes place, it is necessary to find the present orientation of the satellite. Having determined its present orientation and knowing the desired orientation, the required amount of attitude correction can be established. Attitude or orientation

---

**3.** Precession is the change in the orientation, with respect to an external reference frame, of the spin axis of a spinning body.

**4.** *See Williams v. NASA*, 463 F.2d 1391, 175 USPQ 5 (CCPA 1972), *cert. denied*, 412 U.S. 950, 93 S.Ct. 3013, 37 L.Ed.2d 1003 (1973).

sensing is not only needed to establish the amount of correction required, but also to repeatedly pulse the attitude correction jet at the proper phase in the spin cycle to achieve the desired correction in attitude.

The specification states that "[m]eans is provided for sensing the orientation of the satellite relative to the earth, sun, or both."[5] According to the claims in suit, these means, disposed on the body of the satellite, are capable of "providing to a location external to said body of the instantaneous spin angle position" of the satellite about its spin axis and "the orientation of said axis with reference to a fixed external coordinate system." The patent provides for a solar and radio frequency sensing of attitude.

A V-beam sun sensor, which was well known in the art at the time of the Williams invention, was used as the solar orientation sensing device. It measured the sun angle, the angle between the satellite's spin axis and the satellite-sun vector (the sun line), and the spin angle position, the degree of rotation of the jet past the sun line. This information is transmitted to a ground-based control station by means of a directional antenna and provides two of the needed three attitude angles required to establish the geometric position of the satellite in space.

The specification, in addition, indicates that the directional antenna can also be used as an orientation means:

> As to the disclosed means for sensing the orientation of the satellite, * * * it will be understood that other means may be provided. For example, asymmetry may be deliberately introduced into the antenna radiation pattern of the satellite.[6]

In its reports to NASA, Hughes indicated that it planned to rely on the strength and polarization of the satellite signals as an indication of the satellite's orientation with respect to the earth. In maneuvering the SYNCOM satellites, the aforementioned earth and sun orientation means were jointly employed.

Although the specification does not dwell on the details, it does state that the satellite's attitude can be determined at the ground-based control station by the use of well-known spherical trigonometry, the desired precession maneuver calculated,[7] and control signals sent up to the satellite. These control signals are synchronized with the spin cycle of the satellite, and, as a result, the precessing jet is activated at the proper phase of the spin cycle. The specification makes clear that the spin angle indication provided by the solar sensor is used as a time reference for these control signals. The significance of having the control pulses synchronized with the spin cycle of the satellite is explained at Col. 9, lines 18–24, of the patent specification thusly:

> [W]hen the attitude control valve 55 * * [is] opened during only a fraction of one spin cycle, or during portions of several successive spin cycles, the operation must be synchronized with the spin of the satellite 26. Synchronization ensures that the net force is applied to the satellite 26 in the proper direction.

In operation, precession is accomplished, as explained at Col. 8, lines 17–41 of the Williams patent, by the reactive force produced by the jet of nitrogen gas which is expelled by the attitude control nozzle. A thrust is applied parallel to the spin axis and near the periphery of the satellite. In this manner a net torque is produced around an axis perpendicular to the spin axis of the satellite. By periodic pulsing of the attitude control jet for a predetermined portion of a spin cycle of the satellite, with a synchronized control signal, a torque is applied to precess the spin axis in the direction of desired correction. Pulsing of the control jet is continued in subsequent spin cycles until the spin axis of the satel-

---

5. Column 2, lines 25–26.

6. Column 11, lines 9–15.

7. In a May 1960 report to NASA, Williams suggested that the satellite be precessed so that the antenna tip would follow a rhumb line path to the desired attitude.

lite is precessed through 90° and it is parallel to the earth's axis. The spin axis of the satellite can be corrected immediately after the launch operation or at any other time in order to maintain the spin axis parallel to the earth's axis.

Following two office actions by the examiner at the Patent and Trademark Office before whom the patent in suit was pending, neither of which are important to this law suit, plaintiff, on January 3, 1963, filed new claims 15–19 in its pending application for patent. These claims, in applicant's own words "are drawn to applicant's apparatus for changing the attitude and translational velocity of a spin-stabilized body * * *." Applicant argued that the following language of claim 15 was patentably distinct over the art of record:

> [C]ontrol means coupled to said valve for actuating said valve in a series of pulses occurring once per each revolution of said body about said axis and whose starting and stopping times are determined by the instantaneous angle of rotation of said body about said axis with respect to a reference point in space to produce a series of incremental forces that result in a net force on said body in a predetermined direction.

Applicant also maintained that claim 16 was patentable over the cited prior art, since it called for:

> [M]eans associated with said body for expelling fluid more than once from a particular location thereon to exert a series of incremental forces on said body during several revolutions of said body about said axis, said means controlling the duration of each expulsion of fluid to be short compared to the time of one revolution of said body about said axis, said means controlling the time of occurrence of each expulsion of fluid to be at a predeter-

mined part of the cycle of revolution of said body about said axis.

The plaintiff made similar arguments in connection with claims 17–19.

In the next and final office action of December 24, 1963, the examiner rejected these claims as being drawn to an inadequate disclosure. He stated:

> Claims 15–19, newly presented, are rejected as drawn to an inadequate disclosure. There is nothing in the original disclosure to indicate how the starting and stopping time or duration of the pulses is determined by the instantaneous angle of revolution of the body with respect to a reference point. The signals from 71 and 73 are sent by 90 and 50 to earth or another planet *but there is no disclosure as to how such information is converted and used to send back to 90 for control of 93.* [Emphasis added.]

This, in substance, was a rejection pursuant to 35 U.S.C. § 112.[8]

In response to this rejection, Hughes on June 22, 1964, filed an amendment after final rejection, wherein it requested that the Patent and Trademark Office permit it to amend the specification and claims 15–19 of its pending application. The examiner declined to enter the amendment, maintaining that it would introduce new matter into the case, since there was no support for the changes requested in the original specification, and that the proposed amendment would not, in any event, remedy the inadequacy of the disclosure. On June 23, 1964, Hughes filed a notice of appeal of the examiner's decision, but the appeal was never perfected.

On August 21, 1964, Hughes filed a continuation-in-part (CIP) application based upon the original application of April 18, 1960. It is this CIP application[9] from

---

**8.** 35 U.S.C. § 112 provides in pertinent part: "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

**9.** A CIP application contains matter not disclosed in an original application. If the CIP complies with 35 U.S.C. § 120, the originally disclosed subject matter is entitled to the filing date of the original application, but the new matter is entitled to only the filing date of the CIP application.

which the patent in suit ultimately matured. Plaintiff then permitted the original parent application to go abandoned.

IV. *The Continuation-in-Part Application*

Plaintiff's CIP application contained new material that had never previously been disclosed in its original application. This new matter consisted of Fig. 12 and the text of the specification relating thereto. Figure 12 shows a ground-based analog controller for synchronizing the control signals it generates with the spin of the satellite. A rotating drum, formed with a raised cam section, is the analog element disclosed. The spin angle information provided by the sun sensor is used to match the drum's phase of rotation to the rate of spin of the satellite. A fixed switch is positioned such that contact between the leading edge of the cam and the fixed switch coincides with the ground reception of the solar sensor pulse. The speed of the drum is adjusted until such a coincidence occurs. Upon achieving this, the drum has been synchronized with the spin of the orbiting satellite. In addition, a movable switch is positioned such that its closure transmits a control pulse to the satellite for actuation of the attitude adjustment valve.

This analog controller had previously been described in a paper delivered by a Hughes employee to the 18th Annual Meeting of the Institute of Navigation, June 18–20, 1962.

The patent in suit consists of three independent claims. Claim 1, the broadest claim in suit, reads as follows:

1. Apparatus comprising:

a. a body adapted to spin about an axis;

b. fluid supply means associated with said body;

c. a valve connected to said fluid supply means;

d. fluid expulsion means disposed on said body and coupled with said valve and oriented to expel said fluid substantially along a line parallel to said axis and separated therefrom;

e. means disposed on said body for providing an indication to a location external to said body of the instantaneous spin angle position of said body about said axis and the orientation of said axis with reference to a fixed external coordinate system;

f. and means disposed on said body for receiving from said location control signals synchronized with said indication;

g. said valve being coupled to said last-named means and responsive to said control signals for applying fluid to said fluid expulsion means in synchronism therewith for precessing said body to orient said axis in a predetermined desired relationship with said fixed external coordinate system.

Claim 2 differs from claim 1 in that the clause (e) "means" of claim 1 is recited in clause (f) of claim 2 as "wide angle means." In claim 3, element (e) of claim 1 is further limited to "wide angle optical means." The other limitations recited in claims 2 and 3 are not material to this litigation.

V. *Defendant's Argument of Invalidity*

While defendant has raised the usual plethora of defenses common to patent suits in response to plaintiff's petition, a major defense in this lawsuit is that all three of the claims in suit are invalid under 35 U.S.C. § 102(b).

Before the 35 U.S.C. § 102 issue can be resolved, it is necessary to establish the filing date that the claims in suit are entitled to.

Although defendant felt that it was necessary to discuss and consider 35 U.S.C. §§ 112 and 120 in order to make this resolution, in fact, as the following discussion shows, in this case, the resolution can be made from plaintiff's acts and a careful review of the file history of both the parent and CIP applications.

As previously mentioned, a CIP application is one which contains subject matter from a prior application and also additional subject matter which was not present in the

prior or parent application. Under the provisions of 35 U.S.C. § 120,[10] a continuation-in-part application obtains the benefit of the parent application filing date only for the subject matter that is common thereto, whereas the newly added subject matter takes the filing date of the new CIP application.

Both parties agree that the filing date to which the claims in suit are entitled:

[I]s relevant because plaintiff's inventor Williams publicly disclosed the details of his invention in a paper given before the American Astronautical Society in March of 1962 and because the invention was used in the SYNCOM satellite launched by the United States in July, 1963.

Thus, the parties are also in agreement that:

[I]f the claims of the patent in suit were not entitled to the [April 18, 1960] filing date of the Williams parent application, they would be invalid under 35 U.S.Code, § 102, by reason of prior publication and prior public use.

Predictably, defendant argues that the claims in suit are not entitled to the earlier filing date, while plaintiff maintains that they are supported by the parent application.

## VI.  *The Ground-Based Controller is Part of the Combination of Claims in Suit*

Before a decision can be made on whether the claims in suit are entitled to the April 18, 1960, filing date of the parent application, or to the August 21, 1964, date of the CIP, the scope and meaning of the claims must first be ascertained.[11] Defendant urges that the following underlined language from claim 1 makes the ground-

based synchronous controller, which was disclosed for the first time by Fig. 12 of the CIP application, an element of the claim:

e.  means disposed on said body for providing an indication to a location external to said body of the instantaneous spin angle position of said body about said axis and the orientation of said axis with reference to a fixed external coordinate system;

f.  and means disposed on said body for receiving from said location control signals synchronized with said indication;

g.  said valve being coupled to said last-named means and responsive to said control signals for applying fluid to said fluid expulsion means in synchronism therewith for precessing said body to orient said axis in a predetermined desired relationship with said fixed external coordinate system.  [Emphasis added.]

Plaintiff, on the other hand, urges that the controller is not part of the claimed invention.

### A.  *Analysis of Claims Show that Ground Controller is Part of Combination*

An analysis of the underlined claim language, made in the context of the claim as a whole, together with the language of the specification and also plaintiff's arguments to the Patent Office during the prosecution of the CIP application, leads me to conclude that a ground-based synchronous controller is an element of the claims.

This conclusion flows naturally from an analysis of elements (e)–(g) of claim 1. Element (e) calls for "means" disposed on the satellite "for providing an indication [of the instantaneous spin angle position of the sat-

---

**10.**  35 U.S.C. § 120 provides:

"An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and

if it contains or is amended to contain a specific reference to the earlier filed application."

**11.**  This court has long maintained, *see Autogiro Co. of America v. United States,* 181 Ct.Cl. 55, 384 F.2d 391 (1967), that the claims of a patent are construed by reference to the specification and drawings of the patent, and by the circumstances surrounding the prosecution of the patent application through the Patent and Trademark Office.

ellite] <u>to a location external to said body</u>." (Emphasis added.) From a review of the patent in suit there is no doubt that this element includes radio frequency transmitter 90, a first orientation sensing solar cell 71, and a first orientation signal oscillator 95. In fact, Col. 8, lines 32–36 provides:

The correct phase of the spin cycle to actuate the valve 55 *is determined from the earth* 100 by means of the first orientation sensing solar cell 71 adjacent the slit 70 in the satellite 26 and its associated oscillator 95 * * *. [Emphasis added.]

Thus it is clear that element (e), among other things, calls for means that transmits the instantaneous spin angle position information of the satellite to the ground.

In response to this ground-received indication, a pulse for actuation of the attitude control valve 55 is transmitted back to the satellite from earth. This is succinctly stated at Col. 8, lines 31–32 of the patent, thusly:

The attitude control value 55 [on the satellite] is pulsed by radio control from the earth 100.

The satellite is provided, *see* element (f) of claim 1, with "means * * * for receiving from said location [earth] control signals synchronized with said indication." Thus "means," and, as the original specification teaches, a radio frequency receiver 89 as shown in Fig. 6, is located on the satellite to receive control signals from earth. However, element (f) goes on to provide that the control signals are to be synchronized with the "indication" of the instantaneous spin angle position of the satellite about its spin axis.

It can thus be appreciated that some device located on the earth is required to produce the synchronized control signals and transmit them to the satellite's receiving means.

As explained by element (g) of claim 1, the satellite will be precessed in response to the received control signals. Thus, in effect, what is being claimed by elements

(e)–(g) is apparatus carried by the satellite for transmitting information about its spin angle position to an external location, *i. e.*, earth; externally located apparatus for producing control signals which are synchronized with the spin angle position of the satellite; and apparatus on the satellite for responding to the received control signals for precessing the satellite.

B. *Plaintiff's Arguments Show Ground-Based Controller Essential to Claims in Suit*

Support for the above analysis and conclusions is found in arguments made by the plaintiff in prosecuting the patent application through the Patent and Trademark Office. It is, of course:

A fundamental principle of claim construction * * * that a claim should be interpreted in light of its file wrapper or prosecution history in the Patent Office. *Graham v. John Deere Co.*, 383 U.S. 1, 33, 86 S.Ct. 684, 701, 15 L.Ed.2d 545, 148 USPQ 459, 473 (1966).[12]

As of July 16, 1965, after almost a year of prosecuting the CIP application, a number of claims had been allowed by the Patent and Trademark Office. However, the issuance of patent No. 3,216,674 on November 9, 1965, to Mr. William B. McLean changed all this, for on January 10, 1966, the examiner withdrew the allowance of all claims and issued a final rejection of plaintiff's patent application.

Plaintiff on April 29, 1966, filed a proposed amendment after final rejection wherein he cancelled all of the previously pending claims and submitted application claims 19–21. These claims ultimately issued as the claims in suit, claims 1–3. In plaintiff's own words:

These claims [claims 1–3 of the patent in suit] were rewritten to put them in better form (the paragraph form) *and to change the wording so that the claims more clearly distinguish over the newly-cited reference*, McLean. [Emphasis added.]

---

12. *Farrell Marine Devices, Inc. v. United States*, 179 Ct.Cl. 790, 804, 377 F.2d 560, 568–

69, 153 USPQ 361 (1967).

An example of the changes in the claims which plaintiff made to distinguish plaintiff's invention from the McLean patent can be seen in elements (e)–(g) of claim 1. In explaining this to the examiner, plaintiff stated:

In the exemplary embodiment disclosed in the specification [which includes Fig. 12 and the related text added to the CIP], means (e) and (f) are the apparatus for generating and transmitting the solar sensor pulses to an external control point, and the apparatus for receiving the control signals. McLean, having an internally controlled guidance system, provides no means for exchanging signals with an external control point.

In further distinguishing over McLean, plaintiff stated:

He provides no spin reference indication to an external location and receives no control signals from an external location. McLean's device would be incapable of performing the function of applicant's claimed invention; namely re-orienting the spin axis to point in a desired direction while in orbit. * * * *Furthermore, it is under no external control, as is applicant's claimed invention.* * * * Applicant's claimed invention can be re-oriented many times, to point the spin axis in many different directions *upon command from an external control point.* [Emphasis added.]

Thus, in plaintiff's own words, it is clear that the claimed invention contemplated external control of the satellite. Indeed, that was the very differentiating feature urged upon the Patent Office to obtain the patent. As the above-cited portion of the file wrapper of the patent in suit demonstrates, Williams invented a satellite which could be precessed in many different directions upon command from *an external location.* The claims themselves are drafted in such a manner so as to define a system that is, as a result of all of the recited elements, capable of precessing the satellite on command from an external location. Without the ground-based control station, plaintiff's sat-

ellite cannot be precessed, for it does not, unlike McLean, contain any on-board hardware with which to accomplish the desired precession. The satellite merely gathers information useful for determining in which direction its spin axis is pointing and the speed at which it is spinning about its spin axis. The satellite is provided with devices for transmitting such information to earth, and devices for receiving control signals synchronized with its angular spin position for initiating the command precession maneuver. There is no equipment carried on board the satellite for calculating its instantaneous spin angle position, nor the desired attitude of the spin axis. All calculations for the patented satellite must be accomplished on the ground. Moreover, the claims are written, by plaintiff's own admissions, to cover this external control feature. Thus, in order to make and operate the claimed invention, it is necessary to have ground-based external control means.

### C. *The CCPA's Evaluation of Invention Requires Ground-Based Controller*

Independent evidence that an external control means is a necessary element of the Williams invention is found in a recent Court of Customs and Patent Appeal's decision concerning title to the patent in suit.[13] In the course of its opinion, the court described its understanding of the claimed invention as follows:

The invention in dispute is apparatus for controlling the attitude or orientation of the spin axis of a spinning body by applying a precessing torque to the body *under control from a location external to the body,* defined in representative claim 19 * * *. [463 F.2d at 1394, emphasis added.]

\* \* \* \* \* \*

In essence, the invention is directed to a spinning body *operated by remote control from a location external to the body* to pulse a nozzle at a selected position in successive spin cycles to precess the body in a selected direction. The remote control link between the body and the exter-

**13.** *See* n. 4, *supra.*

nal location was a radio system described very broadly in the application. It is apparent from the record that the prior art in that area was already well developed. Only the feasibility of *the combination of the pulsed jet precessing means with external monitoring and controlling means, as broadly recited in the claims,* was left to be proven. [463 F.2d at 1398, footnote omitted, emphasis added.]

Thus, the CCPA also clearly recognized that some means of receiving the spin angle information, developing a control signal therefrom in synchronism with the instantaneous spin angle position of the satellite, and transmitting that control signal back to the satellite for initiation of the precessing operation, in other words, some external control means, was necessary in order to make and use the claimed invention.

### D. Decisions made by PTO do not Support Plaintiff's Position

#### 1. Dropping of Cole Reference does not mean that PTO felt Claims did not Include Ground-Based Controller

Plaintiff argues that the claims do not cover any ground-based apparatus, but rather that they recite apparatus carried on board the satellite adapted for cooperation with external control equipment. Plaintiff points to the file history of the CIP and the actions of the examiner shown therein, to support its theory.

Plaintiff especially points out that the Patent and Trademark Office examiner was aware of an article, entitled *Guidance and Control of 24-Hour Satellites,* by Mr. Roger W. Cole, an orbital analyst employed by plaintiff, that was presented by him at the Institute of Navigation's June 18–20, 1962, meeting in San Diego, California, and which later appeared in *Navigation* (Winter 1962–63). Plaintiff reasons that the examiner would not have allowed claims that relied on new matter which appeared for the first time in plaintiff's CIP application, since any such claims would have been invalid under

35 U.S.C. § 102. Accordingly, plaintiff argues that since the examiner felt Williams was not entitled to claims specifically reciting Fig. 12 apparatus, the subsequent allowance of claims 1–3 of the patent without citing the Cole publication amounts to a recognition by him that those claims were not so limited. Plaintiff, therefore, argues, as it must in order to uphold the validity of the patent, that the examiner allowed the claims at bar because they were fully supported by the original specification, without reliance on Fig. 12 and its accompanying description, which was inserted for the first time into the CIP application. A review of the file history of both plaintiff's original and CIP applications fails to support plaintiff's position.

#### 2. Plaintiff's Actions and Statements before PTO show that Claims in suit Included Ground-Based Controller [14]

Attention is initially directed to plaintiff's original April 18, 1960, application. Following two office actions, the Patent and Trademark Office had allowed only claims 3–5, 7 and 8. The remainder of the original application claims had either been rejected on art or had been cancelled by plaintiff. Of the allowed claims, claims 3 and 4 were directed to a nutation damper which is not involved in this litigation. However, all of the remaining claims, 5, 7 and 8, were directed to a combination of elements that are properly disclosed and described by plaintiff's original application. For example, in pertinent part, claim 5 provided:

> [C]ontrol means disposed within said body; * * * first and second controllable valves individually connected to said means for supplying a gas and to said control means for passing said gas in response to said control means; * * *

This is to be contrasted with the language which appeared in plaintiff's claims 15–19, which were submitted by a January 3, 1963, amendment to its original application. By way of example, claim 15, after

---

**14.** This section repeats to some extent the arguments previously made in section VI B, *su-*   *pra,* although in considerably more detail.

calling, *inter alia*, for a valve to control the emission of a fluid under pressure, called for:

> [C]ontrol means coupled to said valve for actuating said valve in a series of pulses occurring once per each revolution of said body about said axis and whose starting and stopping times are determined by the instantaneous angle of rotation of * * * [the satellite] about * * * [its] axis.[15]

As has been discussed in detail hereinabove, claims 15–19 were finally rejected by the Patent and Trademark Office as being unsupported by the disclosure in the original specification.

Although plaintiff filed an appeal from the examiner's decision rejecting claims 15–19, the appeal was allowed to lapse by plaintiff's failure to file its appeal brief within the allotted time.

Shortly thereafter, plaintiff filed its August 21, 1964, CIP with allowed claim 5 appearing as CIP application claim 14.

There can be little doubt that the filing of plaintiff's CIP application constitutes an admission by plaintiff that its original April 18, 1960, application did not contain sufficient disclosure of the ground controller to support the combination covered by claims 15–19. The above events are significant since they clearly demonstrate that plaintiff could have claimed and obtained a patent to the subject matter disclosed by its April 18, 1960, application if it were willing to accept claims such as original claims 3–5 or 7–8. It was only when plaintiff insisted upon going beyond its original disclosure in an attempt to implicitly or explicitly claim the ground-based controller that it got into a dispute with the Patent and Trademark Office.

In the first office action following plaintiff's August 21, 1964, filing of its CIP application, the examiner rejected a number of claims as anticipated by the Cole article. In substance, the examiner's position was that the occurrence and duration of the pulses to actuate the precessing valve were not disclosed by the original application. The examiner specifically stated that:

> The subject matter of applicant's Fig. 12, relating to the means for controlling the starting and stopping times, and duration, of control valve actuation, so as to be in synchronism with body rotation, as determined by a function of the instantaneous angle of rotation of the body with respect to a reference in space, is entitled to the filing date of the instant application only. Thus, Cole's disclosure operates as a statutory bar against such matter, as claimed, under 35 USC 102(b).

In response, plaintiff, by its July 21, 1965, amendment, either cancelled or modified all of the previously rejected claims. With regard to the rejections based on Mr. Cole's article, plaintiff stated:

> Claims 5, 10 and 13 were rejected as being fully met by the Navigation article by Cole under 35 USC 102. Claims 5, 10 and 13 have been amended to delete reference to the control of starting and stopping times and the duration of valve actuation. Accordingly, Cole's disclosure can not now be considered to operate as a statutory bar against claims 5, 10 and 13.

In the next office action, the examiner did not refer again to the Cole reference, instead the pending claims were finally rejected on the basis of the '674 McLean patent which had recently issued, in combination with a previously cited patent, No. 2,991,027, to Geyling under 35 U.S.C. § 103. Hughes then cancelled the rejected claims and inserted, by an amendment after final rejection, new claims 19–21 into the application. These claims were allowed by the examiner without comment, and are the claims, 1–3, presently involved in the case at bar.

As has previously been pointed out, the claims at bar include, among other things, a ground-based controller, and the generation of a control signal which is synchronized with the instantaneous spin angle position

---

15. Claims 16–19 called for "said control means controlling the time of occurrence of each actuation of said valve to be at a predetermined part of the cycle of revolution of said body * * *" or language similar thereto.

of the satellite for actuation of the control valve, which is substantially the same subject matter that plaintiff deleted from CIP claims 5, 10 and 13 after the examiner's citation of the Cole reference. It thus is difficult to understand or explain why claims 19–21 were not rejected by the examiner under 35 U.S.C. § 102(b) in the same manner that he has previously rejected CIP claims 5, 10 and 13.[16]

It must be assumed, since no explanation is given by the examiner to justify his action, that he felt that new CIP claims 19–21 were entitled to the April 18, 1960, filing date of the original application. Plaintiff's own remarks make this explanation untenable. Plaintiff's statements to the examiner regarding new claims 19–21 warrant repeating:

> In the exemplary embodiment disclosed in the specification, means (e) and (f) are the apparatus for generating and transmitting the solar sensor pulses to an external control point, and the apparatus for receiving the control signals. McLean, having an internally controlled guidance system, provides no means for exchanging signals with an external control point.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> With regard to mode of operation and result; McLean \* \* \* provides no spin reference indication to an external location and receives no control signals from an external location.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> *Furthermore, \* \* \* [McLean] is under no external control, as is applicant's claimed invention. \* \* \* Applicant's claimed invention can be reoriented many times, to point the spin axis in many different directions upon command from an external control point. Thus, it may be seen that McLean's disclosed apparatus differs in mode of operation and result from applicant's claimed invention.* [Emphasis added.]

Clearly, the allowance of CIP claims 19–21 in view of plaintiff's own evaluation and statement concerning the patentable distinctions between these claims and the McLean reference makes the examiner's allowance highly questionable.

The importance of a patentee's own statements, even though they are not in the form of an amendment which finds its way into an allowed claim was the subject of *Stewart Warner Corp. v. Lone Star Gas Co.,* 195 F.2d 645, 93 USPQ 74 (5th Cir. 1952). The Fifth Circuit cited with approval the following language from *Consolidated Water Power & Paper Co. v. Kimberly-Clark Corp.,* 107 F.Supp. 777, 789–90 (E.D. Wis.1952), *aff'd,* 204 F.2d 573 (7th Cir. 1953):

> Plaintiffs contend that the file wrapper history may be disregarded where the claims themselves are not amended by insertion of the limitations specified in the course of the arguments included in such file wrapper history. However, the effect of a patentee's arguments in the Patent Office in obtaining the allowance of his claims was considered at length in the case of *Barrel Fitting & Seal Corp. of America v. American Flange & Mfg. Co.,* 1935, 74 F.2d 569, where the Court of Appeals for the Seventh Circuit had before it a patent on a barrel fitting or closure. In discussing this question, Judge Evans said, 74 F.2d at page 570:
>
> > "The issue of infringement turns upon the construction of the claims in the light of the explanation which the applicant made to the Examiner in the Patent Office."

After describing the structure disclosed in the patent, and the specifically different structure which was used by the defendant, the court said:

> > "When applicant met with opposition in the Patent Office he sought to dis-

---

**16.** The examiner's action, in allowing claims 19–21 notwithstanding his knowledge of the Cole reference, being ultimately a question of law, is not in any event binding on this court. *Cf. Strachan Shipping Co. v. Shea,* 276 F.Supp.

610 (D.C.Tex.1967), *aff'd* 406 F.2d 521 (5th Cir. 1969), *cert. denied,* 395 U.S. 921, 89 S.Ct. 1773, 23 L.Ed.2d 238 (1969). *Accord, Levinson v. Spector Motor Co.,* 330 U.S. 649, 672, 67 S.Ct. 931, 943, 91 L.Ed. 1158 (1947).

tinguish his invention from that shown by one Sleight who has obtained a patent on a somewhat similar structure."

The court then went on to say, 74 F.2d at page 571:

"The issue presented is one which frequently arises in patent suits. The claim as written may be technically infringed. To secure its allowance in the Patent Office, however, the applicant explained its true scope. By restricting its scope to the actual novelty which truly expressed the asserted discovery, the inventor secured the allowance of his claim. Later when the claim is involved in litigation the patentee argues for a more liberal construction of the language of the claim and ignores the refinements of distinction which he made in order to secure its allowance.

\*    \*    \*    \*    \*    \*

"Applying the foregoing to the facts in the instant suit, we are satisfied that the claims in question would never have been allowed had the appellant asserted their scope to be that for which he now contends. They were allowed only upon his express statement of a limited scope which excluded plugs provided with the usual rubber sealing gasket between the bung and the bushing."

The court held in that case that the patentee had so restricted his claims \* \*.

On the basis of plaintiff's own statements concerning the patentable distinction between its claims and the McLean reference, plaintiff is estopped to now argue that the claims in suit do not include the Fig. 12 ground controller of the CIP application. The correctness of this is reinforced by the fact that McLean discloses the use of internally controlled synchronous control signals to precess a spinning body, whereas, as plaintiff freely admitted to the Patent and Trademark Office, its invention relied on externally controlled control signals to accomplish the same result. There is no doubt that the Patent and Trademark Office, in allowing the claims at bar, placed heavy reliance upon plaintiff's argument that its claimed apparatus was externally controlled whereas McLean was internally controlled.

### VII. Claims in Suit only Entitled to Filing Date of CIP Application

Having found that the claims in suit include as an element thereof the ground controller of Fig. 12, it now becomes important to decide the filing date to be accorded the claims. In order for the claims in suit to obtain the August 18, 1960, filing date of the parent application, the ground controller must have been disclosed therein, for it is axiomatic in patent law that the specifications and drawings of a patent must provide support for the recitation of the invention in the claims. Palmer v. United States, 191 Ct.Cl. 346, 423 F.2d 316, cert. denied, 400 U.S. 951, 91 S.Ct. 242, 27 L.Ed.2d 258 (1970).

As thoroughly discussed hereinabove, plaintiff, by the filing of the CIP, has in effect admitted that the parent application did not contain a disclosure of the Fig. 12 ground controller. A careful review of the original and CIP applications dramatically demonstrates that the synchronous controller and the associated description which was added to the specification were the "new matter" inserted into the CIP application when it was filed. Thus, it must be concluded that the claims in suit are only entitled to the August 21, 1964, filing date of the CIP application.

### VIII. Claims 1–3 are Invalid under 35 U.S.C. § 102

The parties have agreed that the patentee, Williams, publicly disclosed the details of his invention in a paper given before the American Astronautical Society in March 1962. They also are agreed that the inventions covered by the claims in suit were used in a SYNCOM satellite launched by the United States in July 1963. Since both of these acts are more than 1 year prior to the August 21, 1964, filing date of plaintiff's CIP application, these acts constitute statutory bars under 35 U.S.C.

§ 102(b) [17] sufficient to invalidate the claims in suit.

### CONCLUSION

Based upon the above analysis, it must be concluded that claims 1, 2 and 3, the only claims of the Williams patent, are invalid. Accordingly, plaintiff is not entitled to recover, and its petition is dismissed.[18]

### FINDINGS OF FACT

1. This is a patent suit arising under the provisions of 28 U.S.C. § 1498 for reasonable and entire compensation for the unauthorized procurement and/or use by the United States of an invention described and claimed in United States Letters Patent No. 3,758,051 (hereinafter referred to as the "Williams" or "051" patent), entitled "Velocity Control and Orientation of a Spin-Stabilized Body." The patent issued on September 11, 1973, to Donald D. Williams on application Serial No. 391,187, which was filed on August 21, 1964.

2. The Williams patent relates to a general attitude control system (hereinafter "ACS") for spacecraft, that was first used in SYNCOM II and SYNCOM III. SYNCOM II was the world's first synchronous communications satellite. SYNCOM III was the world's first geostationary communications satellite.

3. The question of liability is now before the court. A determination of the amount of recovery, if any, has been deferred until after a final ruling by this court on the issue of liability.

4. Williams' application Serial No. 391,-187, was a continuation-in-part of a prior co-pending application, Serial No. 22,733, which was filed on April 18, 1960, and was later abandoned.

17. 35 U.S.C. § 102(b) provides:

"A person shall be entitled to a patent unless—

      *    *    *    *    *    *

"(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or * * *."

5. A general ACS is one capable of orienting or maintaining a body in any geometrically conceivable attitude while retaining full reorientation capability (*i. e.*, a change of purpose capability).

6. A synchronous satellite is one whose orbital period is equal to the rotational period of the earth. A geostationary satellite is a synchronous satellite whose orbit lies in the equatorial plane of the earth.

7. In 1945, Arthur C. Clarke suggested that three geostationary radio communications satellites be placed into orbit so as to provide complete radio coverage for the entire world. In 1957, SPUTNIK became the world's first artificial satellite. SYNCOM II and III were launched by NASA in 1963–64.

8. A radio communication satellite must be placed in a west-to-east circular orbit in the earth's equatorial plane, and have a period of 24 hours. In order to "hover" above a single point on earth, the satellite must be placed in an orbit having a 22,750 nautical mile radius from the center of the earth and travel around the orbit at a linear velocity of 10,090 ft. per second.

9. To economize on power and weight, communications satellites are equipped with directional antennas. Such satellites can communicate with the earth only when the satellite is oriented so that the directional beam emitted by its antenna can strike the earth.

10. A communications satellite may also be provided with solar cells as a source of power. The efficient use of these cells requires that the satellite be oriented so that the cells are bathed in solar radiation as much of the time as possible.

18. By separate order the majority has changed and tailored the Trial Judge's Findings of Fact Nos. 63, 74, 85, 90 and 97 to fit its theory of the case and has eliminated Nos. 106 and 113 altogether. These changes and omissions are not supported by the evidence, but, since they have been made, I deem it necessary to include all of the Findings of Fact of the Trial Judge so that it may be shown that the facts fully support his decision as well as this dissent.

11. A multistage rocket is typically used to convey communications satellites into a synchronous orbit. The various rocket stages are usually spin-stabilized by use of jet vanes, spin nozzles, or spin rockets. As a result, when the satellite is finally released, it too will be spinning, with its spin axis lying in its orbital plane.

12. This is the least desirable orientation for a communications satellite. By way of example, imagine a geostationary communications satellite spun about its antenna axis. Imagine that its antenna emits a pancake-shaped radio beam. If the satellite's spin axis lies in its orbital plane (*i. e.*, the equatorial plane of the earth), its beam will strike the earth only twice each orbit, for a short time interval each time. (Remember that the orbital radius of a satellite in geostationary orbit is considerably greater than the radius of the earth.) On the other hand, if its spin axis is parallel to the earth's axis, its beam will strike the earth throughout its orbital period.

13. The most desirable orientation for a spinning communications satellite is such that its spin axis is perpendicular to its orbital plane.

14. Satellite orientation may be disturbed by solar radiation or by magnetic fields. For example, if the centroid of the solar radiation pressure is offset from the center of gravity of the satellite, a torque will result, and the attitude of the satellite will change in response thereto.

15. A communications satellite must therefore be equipped with an ACS which will enable it to precess and hold its spin axis into the desired orientation.

16. A suitable ACS must of necessity be light in weight, or the weight saved by using a directional antenna would be added back in the form of elaborate stabilizing equipment (*e. g.*, three axis gyro-and-rocket attitude control systems).

17. Following the successful launching in October 1957 by Russia of SPUTNIK, the world's first artificial satellite, the United States accelerated its efforts in space technology. One of the United States' earliest programs involved Project ADVENT, a communications satellite which was to be placed in geostationary orbit.

Project ADVENT was under the jurisdiction of the Department of Defense. It was to be part of a military satellite communications system which had to encode and decode its own messages and resist jamming by the enemy.

In addition, the ADVENT satellite was not spin-stabilized and thus its ACS was relatively heavy and complex. As a result, the weight of the ADVENT satellite was beyond the launching capability of existing rocket launch vehicles.

18. The orientation of a spinning body is not affected by the translational motion of the body. It is affected only by torques, which are forces applied to the body which do not act through its center of mass. A spinning body will reorient its spin axis if a torque is applied to it. The process of reorientation is known as precession. In the absence of an external torque, a satellite spun-up so that its spin axis points toward Polaris, for example, will remain oriented toward Polaris, despite its orbital motion.

19. The advantages of spin-stabilizing a satellite were set forth by two Hughes Aircraft Company employees, Harold A. Rosen and Donald D. Williams, in United States Patent No. 3,396,920, "Apparatus for Changing the Orientation and Velocity of a Spinning Body Traversing a Path" (filed December 30, 1959; issued August 13, 1968). The patent explained that "[b]y using simple spin-stabilization to orient * * * [a] satellite, the weight and complexity of the satellite * * * [can be] minimized."

20. Rosen, *et al.*, taught a crude system for changing the orientation of a satellite. The spin about the old axis was halted by one set of tangential jets and the satellite was then "spun-up" around a new axis. The versatility of this ACS was limited by the number of sets of spin jets the satellite carried.

21. With this in mind, Dr. Rosen and Mr. Williams considered a different approach toward changing the orientation of

the satellite's spin axis. The satellite was to be equipped with four precessing jets, spaced evenly near the outer periphery of the satellite. These jets were placed so as to fire parallel to, but offset from, the satellite's spin axis. Each jet would be pulsed when the satellite's rotation brought it to the proper spot. Soon thereafter, Mr. Williams established that only a single precessing jet was required to precess the axis toward the desired orientation.

22. The reaction of a spinning body to an applied torque is somewhat counterintuitive. Imagine a spinning disk oriented so that its spin axis is vertical. Let the top face of the disk be marked off like a clock face. Apply an upward force to the rim of the disk at the point marked 9 o'clock. The spin axis of the disk will precess toward 6 o'clock if the disk is rotating clockwise and toward 12 o'clock if it is rotating counterclockwise. Thus, the time the spinning satellite's precessing jet is fired will determine the direction of precession.

23. The first written description of the Williams invention appeared in a January 1960 confidential report on the status of Hughes' Commercial Communication Satellite (COMSAT). This report discusses a spin-stabilized satellite equipped with a directional antenna, a V-beam sun sensor (described below), and a ground-commandable precessing jet.

24. The Hughes management was unwilling to go forward with the Rosen and Williams proposal—a Rosen spin-stabilized satellite equipped with a Williams ACS—without Government support of some kind. NASA was approached in early 1960.

25. Initially, the NASA response was discouraging. While the proposed Hughes satellite was expected to weigh a mere 25 lbs., American booster technology was still in a primitive state: "No booster existed that could put even a 25-pound satellite into a synchronous orbit."

26. In March 1960, Mr. Williams built and demonstrated a dynamic model of the attitude control system, utilizing a spinning wheel supported on a universal joint, with a gas jet pulsed to precess the wheel's spin

axis. On April 18, 1960, Mr. Williams applied for the patent now in suit.

27. In mid-1960, NASA and the Department of Defense decided to establish a joint synchronous satellite communications system, Project SYNCOM.

28. By mid-1960, improved boosters made feasible the injection of a lightweight (less than 100 lbs.) satellite into synchronous orbit.

29. In August 1961 the Goddard Space Center reported to NASA headquarters that the Hughes ACS was lighter and more reliable than systems employing heavy reaction wheels, gyros, and on-board attitude computers. Acting on the recommendation of the Center, Hughes was designated the sole source for the SYNCOM satellite. The sole source designation was justified, in NASA judgment, by the fact that Hughes "submitted the only proposal to NASA indicating that a 24-hour lightweight synchronous satellite having two-way voice communication capability is practicable."

30. The SYNCOM contract between Hughes and NASA was formally executed in August 1961.

31. Williams purports to describe a method and apparatus for controlling the orientation of the spin axis of a spin-stabilized space vehicle. These space vehicles, according to the patent, might include meteorological, astronomical, navigation and communications satellites, space probes and target-seeking vehicles.

32. Williams discloses a single embodiment of the claimed invention, a cylindrical earth-orbiting spin-stabilized radio communications satellite.

33. In order to "steer" the satellite into a desired orientation, a means for sensing the attitude of its spin axis is provided. In the disclosed embodiment, a V-beam sun sensor, composed of two slits 70 and 72 and two solar cells 71 and 73, is used. During each revolution of the satellite this sun sensor generates two electrical pulses (*see* finding 40) which, when received at the earth 100, provide a complete indication of the

"instantaneous spin angle position" (*see* finding 35) of the satellite about its axis, and a *partial* indication (*see* findings 43–45) of the axis' orientation with respect to a "fixed external coordinate system" (*see* finding 39). Also disposed on the skin of the satellite is an antenna 50, whose axis coincides with the spin axis of the satellite. If "asymmetry is deliberately introduced into the antenna radiation pattern," the antenna may, according to the patent, be used to sense the orientation of the satellite. (More accurately, the strength and polarization of its signals, as received by the earth, will be indicative of the orientation of the axis.) (*See* findings 47–49.)

34. According to defendant, the Williams patent does not disclose the invention claimed. Each of the claims requires "means disposed on [a spinning] body for providing an indication to a location external to said body of * * * the orientation of [its spin] axis with reference to a fixed external coordinate system," and each of the claims requires that the body be precessed so as "to orient said axis in a predetermined desired relationship with said fixed external coordinate system."

35. The instantaneous spin angle position ("ISA") of a point on the satellite is a measure of satellite rotation about its axis. An ISA, in angular units, can be given for any fixed position on the rim of the vehicle (*e. g.*, the sun sensor, or the precessing jet nozzle referred to in finding 69) relative to a reference plane (*e. g.*, the plane determined by the spin axis of the satellite, and the sun line).

36. The sun line is a line drawn between the satellite and the sun. The earth line is a line drawn between the satellite and the earth.

37. The sun angle is the angle between the spin axis and the sun line. The earth angle is the angle between the spin axis and the earth line.

38. The roll angle is the angle of rotation, about the sun line, of the spin axis relative to a plane defined by the sun line and the axis of the earth.

39. A fixed external coordinate system is one fixed with respect to the distant stars, *i. e.*, one in which star coordinates do not change. The system used by astronomers has two reference planes, the earth's equatorial plane and the earth's vernal equinoctial plane.

40. It is now appropriate to more fully describe the V-beam attitude sensor. Two slits, a vertical slit and a canted slit, are disposed on the cylindrical surface of the satellite. As the satellite rotates, the vertical slit will pass the sun line and the sun's rays will pass through the slit and strike a solar cell, generating an electrical signal. As the satellite continues its rotation, the rays will pass through the canted slit, giving rise to a second electrical signal (the "slant pulse").

41. The interval between successive sun pulses provides an indication of the spin velocity of the satellite, and the time elapsed since the last sun pulse thus provides an indication of the instantaneous spin angle position of the satellite about its axis.

42. An operator on the ground uses the sun pulse information, together with the antenna polarization information, to perform calculations in order to determine the initial position of the satellite and the proper required action to orient it where desired. Since the angle of inclination of the canted slit with respect to the vertical slit is known, and the spin velocity of the satellite is determinable, the interval between successive sun and slant pulses provides an indication of the angle between the satellite spin axis and the sun line (the sun angle), assuming that the sun angle is small enough so that the sun will pass through the fields of view of both sensors. As the slits are disposed so that they converge as they approach the base of the satellite, the interval is small when the sun is below the satellite equator and large when the sun is above the satellite equator. This sun angle is a *partial* indication (*see* finding 43) of the attitude of the satellite's axis.

43. A single sun angle measurement, taken alone, does not provide enough infor-

mation for a determination of the orientation of the spin axis of a spinning body with respect to a fixed external coordinate system. The spin axis may lie anywhere within a "cone of ambiguity." This may be illustrated with the aid of a pair of scissors. Call the long blade the sun line and the short blade the spin axis. The angle between the blades is the sun angle. The scissors may be rotated about the long blade, so that the short blade assumes a variety of orientations, without changing the angle between the blades. As the scissors are rotated, the short blade describes what a mathematician would call a cone of revolution, and what in this case is referred to as the cone of ambiguity.

44. This ambiguity might be more or less resolved by equipping the satellite with an earth sensor. The earth sensor would yield an earth angle, and a second cone of ambiguity. As the spin axis of the satellite would have to lie on both cones, it could only have one of two possible orientations (the two intersections of the cones). Since it may be difficult to visualize this, an analogy may be helpful. Let us say that a ship determines that it is 100 mi. from New York. If so, the navigator can draw a circle with a 100 mi. radius around New York on a map, and he will know that his ship is located on the circle. If he additionally knows that his ship is 300 mi. from Boston, he can draw a circle with a 300-mi. radius around Boston, and he will know that his ship must be located at one of the two intersections of the two circles. By the application of dead reckoning (see finding 56), one of the two intersections is eliminated and the ship's location established.

45. The existence of these ambiguities and the techniques for overcoming them would have been obvious to any person of ordinary skill in the art of celestial navigation.

46. Such a person would know that these ambiguities could be resolved in at least two different ways: by dead reckoning; or by adding an earth sensor. The disclosed embodiment does teach the use of an antenna with an asymmetric radiation pattern as a crude earth sensor.

47. It was, of course, well known to those persons having ordinary skill in the art that the antenna gain of a satellite-mounted antenna would vary depending upon its orientation with respect to the earth. This was, indeed, the *raison d'être* of the Williams' invention. If the satellite was improperly oriented, there would be a twice-a-day variation in the strength of the signal received from the satellite. The magnitude and timing of the variation in signal strength could be used in the determination of the earth angle. The signal strength could be ascertained with the aid of a simple signal strength meter, located at the receiving station. The specification teaches that "the amount of precession of the antenna axis of the satellite 26 is determined *from the earth* 100," so it is fair to allow the patentee to rely on information sensed on the ground. The V-beam sensor and the RF antenna are both disposed on the spinning satellite, and together they provide an indication of the orientation of the satellite.

48. A person having ordinary skill in the art would also realize that the polarization of the signal received would afford an indication of the earth angle.

49. That signal polarization and strength might be used by a person skilled in the art to calculate an earth angle is not a litigation-inspired afterthought on the part of plaintiff. The Cole publication (see findings 99–101), which described the SYNCOM program, indicated that earth sensing could be used in conjunction with solar sensing.

50. Signal strength and polarization were in fact used as attitude indicators during the attitude correction maneuvers of SYNCOM II.

51. SYNCOM II was launched on July 26, 1963. The first reorientation maneuver was executed on July 31 by means of two pulse trains. The first pulse train (56 sec., 135 pulses) precessed the spin axis by 30°; the second (87 sec., 215 pulses) by 52–53°. Two computational errors marred the first maneuver. Nevertheless the spacecraft's

axis had been brought to within 8.5° of the desired orientation (RA = 47.92°, Dec. = −56.95° ). A second attitude correction maneuver was performed on August 18. The attitude deviation of 8.5° had degraded the received signal strength at Lakehurst, New Jersey, "during the mid-morning hours." The second maneuver brought the attitude of the spin axis to about one degree south of the desired orientation.

52. The following figure from the Hughes report, Syncom 2 Performance During First 60 Days in Orbit (November 1963), shows a mercator plot of the first reorientation maneuver, with sun angle, roll angle (see findings 37 and 38), polarization angle (see finding 53), and precession phase angle (see finding 54). One can easily see from this figure just how the polarization angle could be used as an attitude indication.

MERCATOR PLOT OF REORIENTATION MANEUVER

The following figure shows a plot of the second attitude reorientation maneuver. Note that at the time Lakehurst receptions were being degraded during the mid-morning hours, the spin axis of the satellite was south and east of its optimum orientation. This illustrates the fact that the timing of the degradations indicates the direction of the attitude deviation.

SPACECRAFT +Z AXIS DIRECTIONS BEFORE AND AFTER ATTITUDE CORRECTION

53. The polarization angle is the angle between the vertical plane containing the line of sight and the plane of polarization of the sight received.

54. The precession phase angle is the direction of precession, expressed relative to the projection of the sun line and the equatorial plane of the satellite.

55. The minutes of the Syncom Technical Steering Committee Meeting (November 27, 1963), include a chart "Spacecraft Antenna Patterns Relative Gain vs. Antenna Aspect Angle," which shows how signal strength might be used as an attitude indication. The data plotted was from measurements made on July 28, 1963, i. e., the chart is based upon actual observations.

56. Alternately, the ground controller of the satellite can take advantage of his knowledge of the initial orientation of the satellite. It is clear from the patent specification and from the testimony that when the satellite is injected into synchronous orbit its spin axis lies in the orbital plane. The orbital plane and the sun angle can therefore be used to fix the initial orientation of the satellite. If the precessing jet was precalibrated, i. e., you knew what degree of precession would be induced by a given-duration pulse, the satellite could be steered into the desired orientation by dead reckoning, as the time at which to fire each pulse would be known.

57. Any person of ordinary skill in the art would have found obvious this method of dead reckoning the attitude of the satellite.

58. The dead reckoning technique is, however, subject to two kinds of errors. First, it is unlikely that the satellite will be injected into orbit with its spin axis lying precisely in the orbital plane. Second, the jets are not completely calibratable.

The ground operator may compensate for the latter error by employing a more refined dead reckoning technique. The satellite is first precessed within the orbital plane, then out of the plane, with the sun sensor providing some guidance during the second maneuver.

While these dead reckoning techniques are prone to error, this is true of all dead reckoning techniques, including, presumably, the inertial guidance systems of the prior art, and the velocity adjustment technique taught by Rosen-Williams. Moreover, these techniques can be used in combination for greater accuracy.

59. Defendant contends that the Williams specification is misleading. According to the Williams specification, "[m]eans is provided for sensing the orientation of the satellite relative to the earth, sun, or both." Defendant characterizes this sentence as implying that the earth sensor is *optional*, when, in defendant's view, it is vital to the unambiguous determination of the orientation of the satellite. As will be seen below, an earth sensor is indeed optional, though highly desirable.

60. Instead of determining both a sun angle and an earth angle, the orientation of the satellite in the patented system could be determined from progressive sun angle measurements. By way of analogy, defendant's DSCS series satellites achieve unambiguous attitude determinations by means of a single sensor, an earth sensor, coupled with progressive observations spaced at the quarter marks in its earth orbit. In principle, the same kind of unambiguous attitude determination could be made with a sun sensor, coupled with progressive observations spaced at the quarter marks in its orbit around the sun.

61. This technique of reducing orientational ambiguity would have been obvious to any person of ordinary skill in the art of navigation. There are problems, however, associated with this orientation technique. The satellite attitude is likely to change as the satellite orbits the sun, and adjustments in attitude would be quite time-consuming. But this technique does prove that sun sensors alone can be used to determine orientation, and thereby justifies the "Sun, Earth, or both" language of the specification.

62. Returning to the description of the disclosed embodiment, the V-beam sensor data and other satellite transmissions are received at a satellite ground-based control point and used to calculate the orientation (and the instantaneous spin angle position) of the satellite.

63. The parent application of the patent in suit does not disclose how such calculations are to be made. Reference to the Cole article (*see* findings 99–101) discloses that most of these calculations are solved essentially by providing movable dials on the synchronous controller. The parent application does not disclose the synchronous controller, much less that it contains dials and how the scales on these dials are formulated. While the patent in suit does at least disclose the controller, it does not disclose these dials either.

64. The calculated orientation would then be compared with the desired orientation, and a "course" for proceeding from one orientation to another would be calculated. The course chosen would probably have been either loxodromic or orthodromic (*see* finding 66).

65. For any orientation of the satellite, the spin axis will be pointing toward some point on the celestial sphere. When the satellite is precessed, its spin axis will point toward some other point. Precession may therefore be thought of as a form of navigation, the tip of the spin axis being piloted from one point on the celestial sphere to another.

66. Terrestrial navigators frequently set "great circles" or "rhumb line" courses. A great circle is a circle formed by the intersection of a spherical surface and a plane passing through the center of the sphere. An orthodrome is a segment of a great circle which connects two stated points.

A rhumb line is a spiral path on the surface of a sphere which crosses each latitude line at the same angle. A loxodrome is a segment of a rhumb line which connects two stated points.

67. The advantage of a great circle route is that it will be the shortest distance between the point of origin and the point of destination. The advantage of a rhumb line route is that the navigator need give the "helmsman" merely a single compass heading to follow.

As a terrestrial navigator may follow either a great circle route or a rhumb line route from his point of origin to his point of destination, so too may a celestial navigator precess a satellite so that the tip of its spin axis traverses either a great circle route or a rhumb line route across the celestial sphere as it assumes a new orientation.

68. The advantages and disadvantages of great circle and rhumb line routes, and the manner of calculating such routes between chosen points, are well known to all persons of ordinary skill in the art of navigation.

69. Before considering the manner in which the satellite's course is set, it is best that the mechanical means by which it changes its orientation is described.

The attitude of the satellite is changed in response to external control signals, the latter being synchronized with the spin cycle of the satellite (*see* finding 74). The satellite is equipped with pressure tanks 53 which supply fluid to an attitude control valve 55. When the valve is opened in response to the control signal, the fluid is expelled through a nozzle 57. (The tank-valve-nozzle system will be referred to, on occasion, as the precessing jet). The nozzle is disposed and oriented so as to expel the fluid along a line substantially parallel to the satellite's spin axis and separated therefrom. If the fluid is expelled only during a predetermined portion of a spin cycle of the satellite—as determined by the synchronism of the control signals with the satellite's spin cycle (*see* finding 70)—the satellite will be precessed in the desired direction.

70. Figures 8 through 11 of the patent illustrate a simple attitude correction maneuver. Figure 8 shows the satellite spinning counterclockwise with its spin axis perpendicular to the earth's spin axis and the axial jet at 9 o'clock (the top of the page being 12 o'clock). The jet is pulsing, and the indicated direction of precession is toward 12 o'clock. (*See* finding 22.)

Figure 9 shows the spinning satellite, its axis somewhat precessed from its original position, and its axial jet, now silent, in the 6 o'clock position.

Figure 10 shows the satellite again, this time with its axial jet in the 9 o'clock position once more. The jet is pulsing, and again the satellite's direction of precession is toward 12 o'clock.

Figure 11 shows the spinning satellite, its axis now fully precessed into an orientation parallel to the earth's axis.

71. The factor which controls the direction of precession is thus the ISA position of the jet at the time the attitude control valve is opened.

72. The precessing jet is enabled as soon as the control signal is received at the satellite though, of course, there is a momentary delay before the solenoid-controlled valve is opened and the gas is expelled.

73. Thus, ultimately, the direction of precession is controlled by the timing of the control signals which must take into account the transmission propagation delays and valve actuation delays.

74. In Fig. 12 and the associated text, the Williams specification purports to disclose a ground-based analog control system to be used to determine the times at which jet-actuating signals are to be transmitted to a satellite. An analog control system is one in which a control element (*e. g.*, a rotating cam) behaves in some important respect (*e. g.*, speed and phase of rotation) just like the subject (*e. g.*, a satellite). The most important elements shown in Fig. 12 are a single lobe rotating cam, a fixed cam-controlled switch, a movable cam-controlled switch, and a motor to drive the cam. The speed of the motor driving the cam is adjusted to synchronize the rotating cam with the spinning satellite. Adjustments are made until the fixed switch is actuated at the same time as the sun pulse, or other spin angle reference signal, is received on the ground. Upon achieving this, the drum has been synchronized with the spin of the orbiting satellite.

75. When the movable switch is closed, the control signal is then sent up to the satellite.

76. If there were no delays between the broadcasting of the control signal and the opening of the valve, and the valve actuating pulse could be of high intensity and brief duration, matters would be simpler. By way of example, assume that the satellite was spinning at a rate of 1 r. p. s., and that the thruster was one-quarter of the way around the satellite rim from the V-

beam sensor. If the thruster were pulsed one-quarter of a second after the sun pulse, its ISA at the time of pulse would be zero (*i. e.*, it would lie on the sun line), and the direction of precession would be perpendicular to the sun line.

77. Since a narrow pulse is not feasible, the thruster might be opened one-sixth of a second after the sun pulse and closed one-third of a second after the sun pulse and the net result would be that the thruster is actuated symmetrically about its zero ISA so that the net effect would be as described in the example of finding 76.

78. But now assume that the sun pulse takes one-tenth of a second to reach the earth and the control signal takes one-tenth of a second to reach the satellite, and that there is a further delay of one second in the satellite electronics and mechanisms. If so, the control signal must be sent up one-fifth of a second after the sun pulse is received. This is equivalent to saying that the movable switch must be positioned 288° away from the fixed switch.

79. The need for these corrections is set forth in the patent.

80. It was previously pointed out that if a mariner sails a "rhumb line" (loxodromic) course, the helmsman just holds the initial course heading. In a loxodromic reorientation of the satellite, the satellite controller maintains the initial direction of precession by pulsing the jet at the same ISA each cycle. This is accomplished by leaving the movable cam switch in place after its initial setting.

81. Orthodromic precession of a satellite controlled by the rotating cam device of Fig. 12 would require resetting the position of the movable switch after each pulse. Loxodromic precession would not suffer from this inconvenience. However, orthodromic precession is at least feasible (as a result of the advance of the computing arts, which makes possible the recomputation of the desired position of the movable switch in real time), and presumably has the advantage of requiring fewer pulses in achieving a new orientation. The advantages and disadvantages of these two modes of precession are discussed in Williams', Dynamic Analysis and Design of the Synchronous Communication Satellite (TM–649, May 1960), at 36:

> If the locus of the spin axis on a unit sphere is considered, then in this case it is a loxodrome or rhumb line, the pole being defined by the direction to the sun, * * *. This is *a desirable means* of precession because the phase at which the jet is pulsed relative to the solar sensor signal is constant during the operation. The penalty is a loss in efficiency, relative to a "great circle" route. [Emphasis added.]

Williams does not say that loxodromic precession is the best mode, but he seems to imply that it is *a preferred mode.*

82. Any person of ordinary skill in the art would realize that the Williams invention could be employed to achieve either orthodromic or loxodromic precession, and would be aware of their relative advantages. This is illustrated by McLean, United States Patent No. 3,216,674, wherein "straight line" (orthodromic) and "spiral" (loxodromic) precession are compared.

83. Accordingly, a person reading the patent in suit and building a satellite as described therein would in fact be practicing a loxodromic mode of precession. For this reason, defendant's contention that the Williams patent is invalid, because it did not disclose which mode of precession was best suited to the analog controls system disclosed therein, is erroneous.

84. A meridian is both a great circle and a rhumb line. If a satellite could be launched so that it could follow a meridional route in precessing from its initial orientation into its operating orientation, this would be very desirable. Attempts were made to achieve this; apparently it was not too difficult to achieve. Although Williams does not disclose the advantage of a meridional initial orientation, this, too, would be obvious to a person of ordinary skill in the art.

85. Signals from the satellite are to be processed at the ground controller. Control signals are in turn sent by the ground con-

troller to the satellite to actuate the precessing mechanism. The patent in suit purports to disclose an analog controller for this purpose, see Fig. 12, and Col. 9, line 14 to Col. 10, line 50.

86. In a law suit in which title to the patent in suit was at issue, *Williams, et al. v. NASA*, 175 USPQ 5 (CCPA 1972), the court found that such a controller was used to demonstrate its inventive concept. The test upon which the court relied for finding a reduction to practice of the inventive concept occurred on April 2, 1960, approximately 2 weeks prior to the filing in the Patent and Trademark Office of the parent application.

87. The CCPA described its understanding (see finding 86) of the claimed invention as follows:

The invention in dispute is apparatus for controlling the attitude or orientation of the spin axis of a spinning body by applying a precessing torque to the body *under control from a location external to the body*, defined in representative claim 19 * * *. [463 F.2d at 1394, emphasis added.]

\* \* \* \* \* \*

In essence, the invention is directed to a spinning body *operated by remote control from a location external to the body* to pulse a nozzle at a selected position in successive spin cycles to precess the body in a selected direction. The remote control link between the body and the external location was a radio system described very broadly in the application. It is apparent from the record that the prior art in that area was already well developed. Only the feasibility of *the combination of the pulsed jet precessing means with external monitoring and controlling means, as broadly recited in the claims*, was left to be proven. [463 F.2d at 1398, footnote omitted, emphasis added.]

*Patent Office Proceedings Regarding Williams Patent Applications*

88. The Williams parent application was filed in the Patent and Trademark Office on April 18, 1960, and was accorded Serial No. 22,733. It contained essentially the same Figs. 1–11 and their accompanying descriptions as are found in the patent in suit. It did not contain either Fig. 12 nor its corresponding description, as found at Col. 9, line 14, to Col. 10, line 50, of patent in suit. Thus, there was no disclosure in the parent application of the ground-based controller mechanism.

89. Art first cited during the prosecution of the parent Williams application included:

Schlesman, United States Patent No. 2,852,208, Method and Apparatus for Telemetering Information from a Missile in Flight, filed April 11, 1950, and issued September 16, 1958;

Hauessermann, United States Patent No. 2,973,162, Attitude Control System for Space Vehicles, filed February 12, 1959, and issued February 28, 1961;

Geyling, United States Patent No. 2,991,-027, Passive Repeater for Satellite Communications Systems, filed December 15, 1959, and issued July 21, 1961; and

Yoler, United States Patent No. 2,951,-659, Attitude Sensing and Control System, filed March 11, 1957, and issued September 6, 1960.

90. After two office actions of no import to the instant suit, the Patent and Trademark Office had allowed only claims 3–5, 7 and 8. The remaining claims of the original application had either been rejected on art or had been cancelled by plaintiff. Of the allowed claims, claims 3 and 4 were directed to a nutation damper which is not included in this litigation. However, all of the remaining claims, 5, 7 and 8, were directed to a combination of elements that are properly disclosed and described by plaintiff's original application. For example, in pertinent part, claim 5 provided:

[C]ontrol means disposed within said body; * * * first and second controllable valves individually connected to said means for supplying a gas and to said control means for passing said gas in response to said control means; * * *.

91. After these two office actions, plaintiff, on January 3, 1963, filed new claims 15–19 in the application. These claims, in applicant's own words, "are drawn to applicant's apparatus for changing the attitude and translational velocity of a spin-stabilized body * * *." On the basis of the following language, plaintiff contended that claim 15 was patentably distinct over the art of record:

[C]ontrol means coupled to said valve for actuating said valve in a series of pulses occurring once per each revolution of said body about said axis and whose starting and stopping times are determined by the instantaneous angle of rotation of said body about said axis with respect to a reference point in space to produce a series of incremental forces that result in a net force on said body in a predetermined direction.

Applicant also maintained that the following limitation of claim 16 made it patentable over the cited prior art:

[M]eans associated with said body for expelling fluid more than once from a particular location thereon to exert a series of incremental forces on said body during several revolutions of said body about said axis, said means controlling the duration of each expulsion of fluid to be short compared to the time of one revolution of said body about said axis, said means controlling the time of occurrence of each expulsion of fluid to be at a predetermined part of the cycle of revolution of said body about said axis, * * *.

92. Similar arguments for patentability were made by plaintiff in connection with claims 17–19.

93. In the final office action of December 24, 1963, the examiner rejected claims 15–19 based upon prior art and also rejected them based upon an inadequate disclosure. In a rejection, which in substance is based on 35 U.S.C. § 112, the examiner stated:

Claims 15–19, newly presented, are rejected as drawn to an inadequate disclosure. There is nothing in the original disclosure to indicate how the starting and stopping time or duration of the pul-

ses is determined by the instantaneous angle of revolution of the body with respect to a reference point. The signals from 71 and 73 are sent by 90 and 50 to earth or another planet *but there is no disclosure as to how such information is converted and used to send back to 90 for control of 93.* [Emphasis added.]

94. In response to this final rejection, Hughes filed an amendment in which it purported to respond to the rejection by requesting amendment of the specification and claims 15–19 "to more specifically recite that the control means actuates the thrust producing means or fluid jets during the same predetermined portion of each of a predetermined number of revolutions of the spin stabilized body or communications satellite."

95. The examiner denied entry of applicant's Rule 116 amendment because he found that the matter to be inserted into the specification was new matter: "[T]here being no support in the original disclosure" for this matter; the amendments to claims 15–19 would involve new matter; "[t]he proposed amendment has not remedied the inadequacy of disclosure * * *"; and "[t]he claims as amended would still fail to avoid the art rejections, neglecting the new matter inserted by the amendment."

96. Thereafter, on June 23, 1964, Hughes filed a notice of appeal, but did not perfect it by timely filing its brief, and subsequently filed the Williams CIP application on August 21, 1964, from which the patent in suit ultimately issued. The parent application ultimately went abandoned.

97. The CIP application contained new material that had not previously been disclosed in its original application. This new matter consisted of Fig. 12 and the text of the specification relating thereto.

98. The CIP application contained allowed claim 5, which appeared in the CIP application as claim 14.

99. Art first cited during the prosecution of the Williams CIP application included:

McLean, United States Patent No. 3,216,-674, Proportional Navigation System for a Spinning Body in Free Space, filed June 8, 1959, and issued November 9, 1965; Yaffee, *U.S. Plans Gyro-Stabilized Solar Satellite, Aviation Week* 26–7 (Oct. 12, 1959); and

Cole, *Guidance and Control of 24-Hour Satellite, Navigation* 270–78 (Winter 1962–63).

100. The ground-based analog controller (*see* finding 74) had previously been described in a paper delivered by a Hughes employee to the 18th Annual Meeting of the Institute of Navigation, in San Diego, California, on June 18–20, 1962. This paper, entitled *Guidance and Control of 24-Hour Satellites,* by Mr. Roger W. Cole, an orbital analyst employed by plaintiff, later appeared in *Navigation* and is the Cole reference identified in finding 99.

101. Thus, the Cole reference predated the CIP application but not the parent application.

102. In the first office action following plaintiff's August 21, 1964, filing of its CIP application, the examiner rejected a number of claims as anticipated by the Cole article. In substance, the examiner's position was that the occurrence and duration of the pulses to actuate the precessing valve was not disclosed by the original application. The examiner specifically stated that:

The subject matter of applicant's Fig. 12, relating to the means for controlling the starting and stopping times, and duration, of control valve actuation, so as to be in synchronism with body rotation, as determined by a function of the instantaneous angle of rotation of the body with respect to a reference in space, is entitled to the filing date of the instant application only. Thus, Cole's disclosure operates as a statutory bar against such matter, as claimed, under 35 U.S.C. 102(b).

103. As of July 16, 1965, after almost a year of prosecuting the CIP application, and after the first office action, a number of claims had been allowed. In response to the first office action, plaintiff, by its July 21, 1965, amendment, either cancelled or modified all of the previously rejected claims. With regard to the rejections based on Mr. Cole's article, plaintiff stated:

Claims 5, 10 and 13 were rejected as being fully met by the Navigation article by Cole under 35 U.S.C. 102. Claims 5, 10 and 13 have been amended to delete reference to the control of starting and stopping times and the duration of valve actuation. Accordingly, Cole's disclosure can not now be considered to operate as a statutory bar against claims 5, 10 and 13.

104. In the next office action, on January 10, 1966, the examiner did not refer again to the Cole reference, instead, the examiner withdrew the allowance of all claims and the pending claims were finally rejected pursuant to 35 U.S.C. § 103 on the basis of the '674 McLean patent which had recently issued, in combination with a previously cited patent, No. 2,991,027, to Geyling.

105. Plaintiff, on April 29, 1966, filed a proposed amendment after final rejection wherein he cancelled all of the previously pending claims and submitted application claims 19–21.

106. In distinguishing his invention over McLean, plaintiff argued:

These claims were re-written to put them in better form (the paragraph form) *and to change the wording so that the claims more clearly distinguish over the newly-cited reference,* McLean. [Emphasis added.]

An example of the changes in the claims which plaintiff made to distinguish its invention from the McLean patent, can be seen in elements (e)–(g) of claim 1. In explaining this to the examiner, plaintiff stated:

In the exemplary embodiment disclosed in the specification [which includes Fig. 12 and the related text added to the CIP], means (e) and (f) are the apparatus for generating and transmitting the solar sensor pulses to an external control point, and the apparatus for receiving the control signals. McLean, having an internally controlled guidance system, provides no means for exchanging signals with an external control point.

\*　　\*　　\*　　\*　　\*　　\*

With regard to mode of operation and result; McLean * * * provides no spin reference indication to an external location and receives no control signals from an external location.

\* \* \* \* \* \*

He provides no spin reference indication to an external location and receives no control singals from an external location. McLean's device would be incapable of performing the function of applicant's claimed invention; namely re-orienting the spin axis to point in a desired direction while in orbit. * * * *Furthermore, it is under no external control, as is applicant's claimed invention.* * * * Applicant's claimed invention can be re-oriented many times, to point the spin axis in many different directions *upon command from an external control point. Thus, it may be seen that McLean's disclosed apparatus differs in mode of operation and result from applicant's claimed invention.* [Emphasis added.]

107. These new claims 19–21 were allowed by the examiner without comment, and are claims 1–3 presently in suit.

108. Claim 1 intended paragraph form provides:

1. Apparatus comprising:
a. a body adapted to spin about in axis;
b. fluid supply means associated with said body;
c. a valve connected to said fluid supply means;
d. fluid expulsion means disposed on said body and coupled with said valve and oriented to expel said fluid substantially along a line parallel to said axis and separated therefrom;
e. means disposed on said body for providing an indication to a location external to said body of the instantaneous spin angle position of said body about said axis and the orientation of said axis with reference to a fixed external coordinate system;
f. and means disposed on said body for receiving from said location control

signals synchronized with said indication;
g. said valve being coupled to said last-named means and responsive to said control signals for applying fluid to said fluid expulsion means in synchronism therewith for precessing said body to orient said axis in a predetermined desired relationship with said fixed external coordinate system.

109. Claim 2 in indented paragraph form provides:

2. Apparatus for applying force to a spinning body by control from a location external to said body comprising:
a. a body adapted to spin about a spin axis passing through the center of gravity thereof;
b. means for supplying fluid under pressure disposed within said body;
c. a controllable valve connected to said means for supplying a fluid;
d. jet-forming means disposed on said body and directed along a line substantially parallel to said spin axis and spaced apart therefrom;
e. said valve being connected to said jet-forming means for supplying fluid thereto when actuated;
f. wide angle means disposed on said body for providing an indication to a location external to said body of the instantaneous spin angle position of said body about said spin axis and the orientation of said spin axis with reference to a fixed external coordinate system;
g. and means disposed on said body for receiving from said location control signals synchronized with said indication;
h. said valve being coupled to said last-named means and responsive to said control signals for the actuation of said valve for precessing said body to orient said spin axis into a predetermined desired relationship with said fixed external coordinate system.

110. Claim 3 in indented paragraph form provides:

3. Apparatus for applying torque to a body spinning about a spin axis by control from a location external to said body, said torque being applied about a predetermined axis normal to said spin axis to precess said spin axis to point in a desired direction comprising:

   a. a body adapted to spin about a spin axis passing through the center of gravity thereof;

   b. fluid supply means for supplying a fluid under pressure disposed within said body;

   c. a controllable valve connected to said fluid supply means;

   d. fluid expulsion means coupled to said valve and attached to said body and oriented to expel said fluid from said body substantially along a line parallel to said spin axis and spaced apart therefrom to enable torque to be applied about any axis normal to said spin axis passing through the center of gravity of said body;

   e. wide angle optical means disposed on said body for providing an indication to a location external to said body of the instantaneous spin angle position of said body about said spin axis and the orientation of said spin axis with reference to a fixed external coordinate system;

   f. and means disposed on said body for receiving from said location control signals synchronized with said indication;

   g. said valve being coupled to said last-named means and responsive to said control signals for the repetitive actuation of said valve for precessing said body to orient said spin axis into a predetermined desired relationship with said fixed external coordinate system.

111. Both parties agree that in order for the claims in the patent in suit to be valid, they must be entitled to the filing date of the parent application because:

[P]laintiff's inventor Williams publicly disclosed the details of his invention in a paper given before the American Astronautical Society in March of 1962 and because the invention was used in the SYNCOM satellite launched by the United States in July, 1963.

These activities constitute § 102 bars to the patentability of claims 1–3, the only claims of the patent in suit, and would render the instant patent invalid unless these claims are entitled to the April 18, 1960, parent application filing date.

112. The parties are also in agreement that:

[I]f the claims of the patent in suit were not entitled to the [April 18, 1960] filing date of the Williams parent application, they would be invalid under 35 U.S.Code, § 102, by reason of prior publication and prior public use.

113. Because of the § 102 bars discussed above, it is not necessary to determine whether the CIP application is enabling, because the claims would not then be entitled to the earlier necessary filing date.

### TRIAL JUDGE'S RECOMMENDED CONCLUSION OF LAW

Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that the claims in suit are only entitled to the August 21, 1964, filing date of the CIP application and that they are, therefore, barred by plaintiff's own acts under 35 U.S.C. § 102(b). Accordingly, plaintiff is not entitled to recover and its petition is dismissed." [End of trial judge's opinion, findings and recommended conclusion]

Both parties and the majority agree that the ground controller device was not described, and, therefore, was not included in the parent application. It was included and described for the first time as new material in Figure 12 and the specifications relating thereto in the CIP application, which was barred by patents, publications and practices intervening between the date of the parent application and the date of the CIP application. The majority says that the

ground controller device (ground-based analog controller) is not a part of the invention and that it is not included nor described in the CIP application. The Trial Judge disagrees and so do I. It is clearly a part of the invention as shown by Figure 12 and is described in the specifications in the CIP application. Figure 12 is as follows:

PATENTED SEP 1 1 1973                                    3,758,051

SHEET 5 OF 5

FIG. 12.

*INVENTOR*
*DONALD D WILLIAMS,*
*BY*

*Noel B. Hammond*

*AGENT*

While Figure 12 may appear somewhat complicated, even a layman can clearly see the radio transmitter and the radio receiver on the diagram. There is no doubt that Figure 12 would be readily understood by anyone skilled in the art. The Trial Judge explained it as follows:

"Plaintiff's CIP application contained new material that had never previously been disclosed in its original application. This new matter consisted of Fig. 12 and the text of the specification relating thereto. Figure 12 shows a ground-based analog controller for synchronizing the control signals it generates with the spin of the satellite. A rotating drum, formed with a raised cam section, is the analog element disclosed. The spin angle information provided by the sun sensor is used to match the drum's phase of rotation to the rate of spin of the satellite. A fixed switch is positioned such that contact between the leading edge of the cam and the fixed switch coincides with the ground reception of the solar sensor pulse. The speed of the drum is adjusted until such a coincidence occurs. Upon achieving this, the drum has been synchronized with the spin of the orbiting satellite. In addition, a movable switch is positioned such that its closure transmits a control pulse to the satellite for actuation of the attitude adjustment valve.

"This analog controller had previously been described in a paper delivered by a Hughes employee to the 18th Annual Meeting of the Institute of Navigation, June 18–20, 1962."

Thus, it appears that the ground-based analog controller was not only included in the CIP application as a part of the invention, but also, as the Trial Judge points out, this identical analog controller was described by an employee of the plaintiff in a paper delivered to an annual meeting of the Institute of Navigation in 1962. If the analog controller did not exist, as the majority would have us believe, how could it have been described by a Hughes employee in 1962?

There is more. The specifications described the ground-based analog controller shown in Figure 12 as a part of the invention, and, furthermore, describe in detail how it functions as a part of the invention. In his regard, pertinent parts of the specifications are as follows:

"*The following specification and the accompanying drawings respectively describe and illustrate an exemplification of the present invention.* Consideration of the specification and the drawings will provide a complete understanding of the invention, including the novel features and objects thereof. Like reference characters are used to designate like parts through the figures on the drawings." Col. 2, lines 34–40 of the patent.

*     *     *     *     *     *

*Fig. 12 is a schematic diagram of a synchronous controller for synchronizing the force applied to the satellite with the spin cycle of the satellite.*" Col. 3, lines 9–11 of the patent.

*     *     *     *     *     *

"As the satellite 26 traverses its orbit 112, it is spinning about its spin axis with an angular velocity of 2.7 rps imparted to it by the fourth state rocket 34. However, the spin axis of the satellite 26 is perpendicular to the earth's axis 102, and thus the antenna 50 does not radiate efficiently toward the earth 100. Accordingly, the satellite 26 is reoriented by precessing its spin axis through 90°. Precession is accomplished by the reactive force produced by a jet of nitrogen gas from the attitude control nozzle 57 which applies thrust parallel to the spin axis near the periphery of the satellite 26. The jet of nitrogen gas is controlled by the attitude control valve 55 to produce a net torque around an axis perpendicular to the spin axis of the satellite 26. By periodically pulsing the jet to be on during only a predetermined portion of the spin cycle of the satellite 26, the torque is applied in the correct plan to precess the spin axis through 90° until it is parallel to the earth's axis 102. The attitude control valve 55 may be actuated during only approximately 60° of the spin cycle of the satellite 26, for example.

"*The attitude control valve 55 is pulsed by radio control from the earth 100.* The correct phase of the spin cycle to actuate the valve 55 is determined from the earth 100 by means of the first orientation

sensing solar cell 71 adjacent the slit 70 in the satellite 26 and its associated oscillator 95 which modulates the radio transmission from the satellite 26. By correcting for the two-way propagation delay, the jet is turned on during the correct portion of the spin angle of the satellite 26 to cause precession in the proper direction. This action is indicated in FIGS. 8–11.

"*The amount of precession of the antenna axis of the satellite 26 is determined from the earth 100* by means of the orientation signal developed by the second orientation oscillator 96 associated with the slit 72 and orientation sensing solar cell 73. This determination can be made only during the time of day that the satellite 26 is in sunlight. However, in the equatorial orbit of the present example, only rarely does the earth 100 come between the sun and the satellite 26, and then only for intervals of short duration. As the satellite 26 spins about its spin axis, the slit 72 periodically passes through sunlight. *Thus a periodic orientation signal is developed and transmitted to the earth 100* and the orientation of the antenna axis with respect to the sun may be determined. This information tells when the necessary precession has been completed.

"Inasmuch as the satellite 26 may have velocity and altitude errors, it traverses only an approximate 24–hour stationary or synchronous orbit 112, and corrections are made by radio control of the velocity control valve 54. *The satellite 26 is tracked from the earth 100 by means of radio signals transmitted to the satellite 26 and relayed back to the earth 100 to determine the drift of the satellite 26 relative to the earth 100.* The velocity of the satellite 26 is increased or decreased by opening the velocity control valve 54 for controlled time intervals during the proper portion of the spin cycle by means of radio control signals." Col. 8, lines 10–68 and Col. 9, lines 1–2 of the patent.

\*　　\*　　\*　　\*　　\*　　\*

"As an example of one means of controlling the starting time and duration of pulses to the jet control valves 54 and 55, in such a way as to result in thrust during the correct portion of each spin revolution, cam-controlled contacts or switches may be used. *Referring to FIG. 12* there is provided a cam 120 driven by a variable speed drive means, such as a synchronous motor 121 excited through an amplified 122 by a variable frequency oscillator 123. The cam 120 has a lobe 124 whose width is equal to the desired angular duration of the jet command pulses, which may be 60°, for example. The cam lobe 124 actuates two switches, 125 and 126. Switch 125 is fixed to the frame supporting the cam 120, and its closure by the cam lobe 124 is used to define a reference instant on each revolution of the cam 124. The time of closure of switch 125 is compared with the time of occurrence of a signal from the sensing solar cell 71, or other spin angle reference signal, transmitted from the satellite 26, and the speed of the motor 121 is adjusted so as to cause these two times to be the same. For example, the signal from the solar cell 71 is received by a radio receiver 127 and applied to a cathode ray oscilloscope 128. The closure of switch 125 applies a voltage from a battery 130 to the cathode ray oscilloscope 128. In this manner, the two times may be compared. The speed of the motor 121 is then adjusted manually until the two signals coincide in time. In the present example, the frequency of the signal from the variable frequency oscillator 123 is adjusted to cause time coincidence. It is also possible to measure the difference in time electronically and to develop suitable electrical signals for automatic control of the speed of the motor 121 which will cause the time difference to approach zero.

"When the switch 125 closes each time that the signal from the satellite's spin angle reference (for example, solar cell 71) is received, the cam 120 has been synchronized with the spin of the satellite 26. If there were no time required for

signals to propagate from the satellite 26 to Earth, then, at any instant, the angle between the leading edge of the cam lobe 124 and the actuator of switch 125 would be equal to the angle between the plane of the fan-shaped field of view of the sensing solar cell 71, and a plane extending longitudinally through the spin axis of the satellite 26 along a line to the Sun." Col. 9, lines 25–68, and Col. 10, lines 1–3 of the patent.

\*    \*    \*    \*    \*    \*

"In order to generate command signals for the valves 54 and 55, switch 126 is employed. Switch 126 is mechanically mounted in such a way that it can be placed in any desired angular position around the cam 120, relative to switch 125. Switch 126 is closed by the cam 120 for the desired portion, say 60°, of the spin revolution. When it is desired to transmit jet command signals, a switch 131 is closed manually so that during each time interval that switch 126 is closed by the cam lobe 124, a voltage from a battery 132 is applied to the radio transmitter 133. The particular subcarrier frequency selected to be radiated by the transmitter 133 determines whether the jet command signal is applied to valve 54 or valve 55." Col. 10, lines 6–19 of the patent. (Emphasis supplied.)

It is difficult to comprehend how the majority could read Figure 12 and the specifications in the CIP application that show in minute detail that the ground controller device is a part of the invention and how it functions and then conclude that it is not a part of the patented device.

The majority compares the satellite to other patented devices, including a sewing machine needle, an electric garage door opener and a television set by saying that those devices, like the satellite, operate with other devices that are not included in the patented devices (*i. e.*, the needle, the door opener, and the television set). In the first place, such examples are so vastly different from the satellite and are so clearly distinguishable that they are not applicable to the problem before us. The needle has

many uses besides its use on a sewing machine, whereas the communication satellite involved here has only one use. When the needle is used, unlike the satellite and the ground controller, it neither sends nor receives radio signals, does not function automatically, and its position cannot be known by the sewing machine operator unless he looks at it. Furthermore, it is not synchronized nor computerized with anything.

The garage door opener is clearly distinguishable. It only *receives* radio signals and cannot and does not send them, whereas the satellite and its ground controller *send and receive* such signals. Also, the door opener is not synchronized and computerized so that it functions automatically as do the satellite and ground controller. There is no way that the operator of the hand-operated radio transmitter can know whether the door is open or closed except by his looking at it, as the door opener does not send radio signals to the transmitter that indicate its open or closed situation. Also, as far as we know, the door opener and the hand-operated radio transmitter may have been patented together as one single invention as the satellite and controller were in the instant case.

The television set likewise only receives radio signals and cannot and does not send them. There is no way that a broadcasting station can know the station or channel to which a television set is tuned, nor can the station require the set to listen to any particular channel. Furthermore, the set and the station are not synchronized nor computerized so that the set works automatically so as to turn itself on and tune in and receive the program of the particular station. To accomplish this, the set must have the manual assistance of a human operator.

For all of the foregoing reasons, among others, it is clear that the needle-garage door opener-television set illustrations are inappropriate to any issue in this case and are of no value to the court in deciding the problem before us.

But we do not have to stop here, as there is more. For instance, when inventor Williams filed the CIP application he was con-

fronted with a dilemma. He had to somehow distinguish his invention from the previously granted patent to McLean whose patented device contained an *internal* mechanism that could change the position of an object cruising in space. He accomplished this by including the ground-based analog controller in his CIP application as a part of his invention. He not only did this, but also urged this difference upon the patent examiner as a reason for the granting of his patent. In this regard, he stated to the examiner:

"In the exemplary embodiment disclosed in the specification, means (e) and (f) are the apparatus for generating and transmitting the solar sensor pulses to an external control point, and the apparatus for receiving the control signals. *McLean, having an internally controlled guidance system, provides no means for exchanging signals with an external control point.*"

\* \* \* \* \* \*

"With regard to mode of operation and result; McLean \* \* \* provides no spin reference indication to an external location and receives no control signals from an external location."

\* \* \* \* \* \*

"*Furthermore, \* \* \* [McLean] is under no external control, as is applicant's claimed invention. \* \* \* Applicant's claimed invention can be reoriented many times, to point the spin axis in many different directions upon command from an external control point. Thus, it may seem that McLean's disclosed apparatus differs in mode of operation and result from applicant's claimed invention.* [Emphasis added.]"

After claiming before the examiner that the ground-based controller was a part of his invention and that this feature was what distinguished it from the McLean patent, the plaintiff should not now be heard to say it is no part of his invention. The Trial Judge correctly held that he is estopped from doing so. Also, by making such representations to the examiner, Williams limited and restricted his invention so as to include the ground-based controller, because otherwise his patent would not have been granted. *See Consolidated Water Power & Paper Co. v. Kimberly-Clark Corp.*, 107 F.Supp. 777, (E.D.Wis.1952), aff'd, 204 F.2d 573 (7th Cir. 1953); *Barrell Fitting & Seal Corp. of America v. American Flange & Mfg. Co.*, 74 F.2d 569 (7th Cir. 1935); and *Stewart Warner Corp. v. Lone Star Gas Co.*, 195 F.2d 645 (5th Cir. 1952).

It is not logical to conclude as the majority has done that the ground-based analog controller is not a part of the Williams invention, because if the controller is eliminated all that the plaintiff would have would be a useless satellite floating around in outer space with no way to control it. Besides, it would be in conflict with the prior McLean patent since it would have no means of changing its position except by its *internal* mechanism.

It should be pointed out that counsel for the plaintiff stated repeatedly at oral argument that the invention involved here would not work without the ground-based controller. Of course, he was correct in making that statement because the controller is a vital and necessary part of the invention.

The decision of the majority is in conflict with the opinion of the Court of Customs and Patent Appeals in *Williams v. NASA*, 463 F.2d 1391, 175 USPQ 5 (CCPA 1972), cert. denied, 412 U.S. 960, 93 S.Ct. 3013, 37 L.Ed.2d 1003 (1973), which was a case involving the ownership of the patent we are considering in the present litigation. In that case the court held:

"The invention in dispute is apparatus for controlling the attitude or orientation of the spin axis of a spinning body by applying a precessing torque to the body *under control from a location external to the body, defined in representative claim 19 \* \* \*.*" 463 F.2d at 1394. (Emphasis added.)

\* \* \* \* \* \*

"In essence, the invention is directed to a spinning body operated by remote control from a location external to the body to pulse a nozzle at a selected position in successive spin cycles to precess the body in a selected direction. The remote control link between the body and the external location was a radio system described very broadly in the application. It is apparent from the record that the prior art in that area was already well developed. Only the feasibility of *the combination of the pulsed jet precessing means with external monitoring and controlling means, as broadly recited in the claims,* was left to be proven." 463 F.2d at 1398. (Emphasis added.)

The court in that case included in its opinion a diagram or sketch of the model of the invention that was presented to the examiner, together with a description of the various parts of the invention, which definitely included the controller as a vital element. An explanation of how the invention worked is set out in the opinion. The diagram, description, and explanation of the invention, its various parts, including the controller, and how the invention and its parts functioned is as follows:

"The diagram shows the dynamic wheel supported in a vertical plane on a laboratory cart. A stroboscopic lamp (STROBE), energized from a signal generator (SIG GEN) *through a synchronous controller* which included a rotating drum, directed its light toward the face of the wheel opposite the cart. A fluorescent lamp, energized from a power source (PS) but subject to imposition of 12,000 c.p.s modulation from an oscillator (12KC OSC) through a modulator (MOD) *under control of the synchronous controller,* was also directed toward the face of the wheel.

"The wheel itself comprised a circular metal disc about 30 inches in diameter. Its mounting on the cart was through a special bearing which supported the wheel at a single point on its axis. The mounting normally allowed spinning of the wheel in a vertical plane as shown, but the bearing had a spherical inner race which permitted the wheel to be tilted to

some degree in any direction relative to that plane.

"On the face of the wheel disposed toward the lamp was a toroidal tank containing nitrogen gas under pressure, a jet nozzle directed along a line parallel to the axis of the wheel and positioned at a location offset from that axis, and a valve controlling admission of gas from the tank to the nozzle. Also disposed on the face of the wheel was a control device, responsive to light resulting from 12,000 c.p.s. modulation of the energy to the fluorescent lamp, to open the valve to the nozzle during such modulation. The device was made responsive to 12,000 c.p.s. modulation in order to enable it to differentiate between light signals from the lamp and light from other sources. The wheel face included spokes on one of which was a mark in the form of a wide arrow pointing radially outwardly toward an X.

"In the tests, the dynamic wheel was brought up to spin speed of about 165 r.p.m. by hand and then a speed sustaining jet system, required to overcome the friction of the bearing and the drag of the air in the laboratory and not part of the invention, was activated to maintain the spin speed constant. *The equipment was brought into synchronism by adjusting the speed of the drum of the synchronous controller* to match the speed of the wheel so that the stroboscopic light emitted a brief high intensity flash once per revolution of the wheel, thus making the arrow and X mark appear stationary at a radial position. *By another adjustment of the controller*, the operator was able to apply 12,000 cycle modulations to the fluorescent lamp during a selected portion of each revolution of the wheel. Since the jet was operated by signals from the fluorescent lamp, the portion of the revolution selected determined the direction of precession of the wheel in a predictable manner.

"During the test, the fact that the wheel was spin-stabilized was demonstrated by moving the car from side to side and observing that the wheel remained in the same position." 463 F.2d at 1395–1396. (Emphasis supplied.)

The above diagram, description and explanation of the invention, together with the opinion of the court clearly show that the controller is a necessary part of the invention.

The majority has overlooked a very important part of the evidence in this case which is the fact that the satellite and the ground-based analog controller are synchronized with each other and this synchronization is constantly maintained by a computer. Obviously, the satellite could not be synchronized with the controller if the controller did not exist. Conversely, the fact that the two are in fact synchronized and are kept synchronized by the analog computer shows that the controller is a part of the invention. Such synchronization might be compared to that which exists in the clutch of an automobile that is operated by a hand gear shift lever. When the operator depresses the clutch the front part of it revolves freely with the motor, but the rear part of it that is connected with the transmission remains stationary, but when the operator puts the car in gear and releases the clutch the front and back part of the clutch mesh and are engaged and become synchronized so that they both revolve at the same speed as the motor.[19] If one were to get a patent on a clutch that is thus synchronized, the entire device would necessarily have to be included in the invention. That is the situation here. The satellite would not work without the controller and the controller would not function without the satellite. If either is missing, there could be no synchronization and the computer would have nothing to computerize.

The majority opinion is based solely on the theory that the ground-based analog controller is only an example of one method

19. The same synchronization occurs between the motor and the transmission of a car with an automatic transmission.

of controlling the position of the satellite and says that other methods could be used, and from this assumption it concludes that the ground controller is not a part of the invention. The trouble with this theory is that it is speculative and theoretical and is not supported by the evidence and is actually contrary to the facts. To sustain this position, the majority quotes only the first sentence of the paragraph in Col. 9, lines 25–29 of the specifications, as follows:

, "As an example of one means of controlling the starting time and duration of pulses to the jet control valves 54 and 55, in such a way as to result in thrust during the correct portion of each spin revolution, cam-controlled contacts or switches may be used."

The majority then takes the words "as an example of one means of controlling the starting time and duration of pulses to the jet control valves 54 and 55 * * * cam-controlled contacts or switches may be used" out of context and holds that this refers to the *entire* ground controller as being only one means of controlling the position of the satellite, whereas the sentence only refers to valves 54 and 55 on the body of the satellite itself. In order to understand the meaning of these quoted words the entire paragraph in which they appear must be read and considered. That paragraph is as follows:

"As an example of one means of controlling the starting time and duration of pulses to the jet control valves 54 and 55, in such a way as to result in thrust during the correct portion of each spin revolution, cam-controlled contacts or switches may be used. *Referring to FIG. 12* there is provided a cam 120 driven by a variable speed drive means, such as a synchronous motor 121 excited through an amplified 122 by a variable frequency oscillator 123. The cam 120 has a lobe 124 whose width is equal to the desired angular duration of the jet command pulses, which may be 60°, for example. The cam lobe 124 actuates two switches, 125 and 126. Switch 125 is fixed to the frame supporting the cam 120, and its closure by the cam lobe 124 is used to define a

reference instant on each revolution of the cam 124. The time of closure of switch 125 is compared with the time of occurrence of a signal from the sensing solar cell 71, or other spin angle reference signal, transmitted from the satellite 26, and the speed of the motor 121 is adjusted so as to cause these two times to be the same. For example, the signal from the solar cell 71 is received by a radio receiver 127 and applied to a cathode ray oscilloscope 128. The closure of switch 125 applies to a voltage from a battery 130 to the cathode ray oscilloscope 128. In this manner, the two times may be compared. The speed of the motor 121 is then adjusted manually until the two signals coincide in time. In the present example, the frequency of the signal from the variable frequency oscillator 123 is adjusted to cause time coincidence. It is also possible to measure the difference in time electronically and to develop suitable electrical signals for automatic control of the speed of the motor 121 which will cause the time difference to approach zero."

This paragraph, properly read and interpreted as a whole, clearly shows that it refers only to various *parts* of the satellite and to various parts of the ground controller and not to the ground controller *as a whole* as being only an example of one means of controlling the satellite. These parts mentioned in the paragraph are listed as follows:

Parts on the satellite:

1. Jet control valves 54 and 55 and solar cell 71

Parts on the ground controller:

1. Cam 120
2. Synchronous motor 121
3. Amplifier 122
4. Variable frequency oscillator 123
5. Lobe 124
6. Switches 125 and 126
7. Motor 121
8. Radio receiver 127
9. Cathode ray oscilloscope 128

10. Battery 130 [20]

It is clear that the majority errs in its interpretation of the above quoted paragraph. Such an interpretation is a slender reed indeed on which the majority bases its opinion in this very important case. The very fact that these parts of the ground controller are so meticulously numbered and their functions described in such detail is further proof that the controller is a part of the invention. Furthermore, they are numbered in such a manner as to logically and numerically fit into the numbering system used in the drawings that form a part of the patent. It is logical to conclude that they would not be so numbered and described if they were not parts of a ground controller that is included in the invention.[21]

It should be noted that a further detailed description of how the ground controller operates as a part of the invention is shown in the specifications as follows:

"In order to generate command signals for the valves 54 and 55, switch 126 is employed. Switch 126 is mechanically mounted in such a way that it can be placed in any desired angular position around the cam 120, relative to switch 125. Switch 126 is closed by the cam 120 for the desired portion, say 60°, of the spin revolution. When it is desired to transmit jet command signals, a switch 131 is closed manually so that during each time interval that switch 126 is closed by the cam lobe 124, a voltage from a battery 132 is applied to the radio transmitter 133. The particular subcarrier frequency selected to be radiated by the transmitter 133 determines whether the jet command signal is applied to valve 54 or valve 55." (Column 10, lines 6–19 of the specifications.)

It will be remembered that switches 125, 126 and 131, as well as cam 120, cam lobe 124, battery 132 and radio transmitter 133 are parts that are located on the ground controller (see Figure 12, supra). It is not likely they would be thus described and their function explained if the ground controller did not exist.

Also, the spherical trigonometric equation that is included in the specifications as a part of the CIP application is a further detailed explanation of how the ground controller functions as a part of the invention. That equation is as follows:

"In order to control the starting time or spin angular position of the pulses, considering the propagation time of the sensor and command signals, let $\psi_1$ be the angle from switch 125 to switch 126 measured in the sense of rotation of the cam 120. Let $\psi_A$ be the angle between the plane of the fan-shaped field of view of the sensing solar cell 71, and the plane longitudinally through the spin axis of the satellite 26 along the sun line, which exists at the time the commance pulse begins to be received at the satellite 26. Then

$$\psi_A = \psi_1 + 2\omega t_p$$

The angle between the average force produced by the nozzle 56 controlled by valve 54, or the torque produced by nozzle 57 controlled by valve 55, and the reference plane (in the present example the plane of the spin axis and the sun line), is $\psi$. This angle $\psi$ is equal to $\psi_A$ plus a constant $\psi_d$ which depends on the orientation of the nozzle with respect to the plane of the sensor, the duration of the pulse sent to the valve, and time delays in the valve and in the electronic circuits. The constant $\psi_d$ may be determined by tests and calculations before the satellite is launched. We then have by substitution $\psi_A$

---

20. The numbers correspond to those in Figure 4 and in Figure 12 of the patent.

21. The various parts of the invention shown in the diagram in the opinion of the CCPA are not numbered but are designated by letters, but the explanation of the letters clearly shows that the synchronous controller is a necessary part of the invention. If the controller is eliminated from the invention, all that the inventor would have left would be an unworkable device that could not be patented.

$$\psi = \psi_1 + \psi_d + 2\omega t_p \quad \text{or}$$
$$\psi_1 = \psi - 2\omega t_p - \psi_d$$

from which equation the required angular position of the command generating switch 126 may be calculated to produce a desired acceleration or precession." (Col. 10, lines 20–49 of the specifications.)

While, as the majority points out, a mathematical formula cannot be patented, it can explain, as it does here, how the various parts of an invention work.

The ground controller shown in Figure 12 and described in the specifications explaining it, and also shown in the diagram included in the opinion of the CCPA and explained therein, is the only ground controller included in or described in the CIP application. No alternative method of control is described or even mentioned anywhere. If any other method of control was contemplated, the inventor should have included it in his patent application, but this he wholly failed to do.

The majority says that Williams invented only the satellite without the analog ground controller. This is contrary to the facts, but if we can assume *arguendo* that it is true, then the invention is invalid because of the prior McLean patent, since without the controller in the Williams patent both inventions would be operated by the same or similar internal mechanisms. This is obviously the opinion of the examiner as well as that of Williams himself in view of the representations Williams made to the examiner regarding the ground controller to distinguish his invention from McLean's.

The majority errs in holding that the ground controller is not a part of the invention and in holding that claims 1, 2 and 3 of the invention are valid.

Accordingly, I would adopt the recommended opinion of Trial Judge Colaianni as the opinion of the court and hold that claims 1, 2 and 3 of the invention are invalid, and dismiss the plaintiff's petition.